<div style="margin-left:1em; float:right">1814.<br>PHILLIPS<br>v.<br>THOMPSON.</div>

---

## G. PHILLIPS *against* THOMPSON AND OTHERS.

*July 5th, 6th, 7th, 8th, 9th, and August 29th.*

Declarations of a person, not a party in interest, nor a party to the suit, and who is a witness in the cause, are not competent evidence.

A plaintiff cannot read his own answer to a bill of discovery [in a *cross suit,* in evidence, unless the defendant chooses first to produce it.

A contract made by an owner of land with the *commissioners*, under the act relative to *draining the drowned lands in Orange county*, (sess. 30. ch. 25.,) by which they were allowed to use each bank of the river *Wallkill*, &c. which they might find necessary, in removing all obstructions, and in deepening and widening the river, &c. and to use, occupy, and enjoy the same, and for which they were to pay a compensation to the owner for the damages, and who agreed to allow them to cut a canal through his lands, is a contract concerning an *interest* in lands, within the purview of the statute of frauds.

To entitle a party to take the case out of the statute, on the ground of part

performance of the contract, he must make out, by clear and satisfactory proof, the existence of the contract as laid in his bill. And the act of part performance must be of the identical contract set up by him.

It is not enough that the act is evidence of *some* agreement, but it must be un-equivocal and satisfactory evidence of the *particular* agreement charged in the bill.

The *commissioners,* under the act above mentioned, had no right to use the lands of the plaintiff, or to remove or destroy his property, without a valid and legal contract with him for that purpose, or until compensation had been made and tendered to him, according to the act.

And where a bill, filed against the commissioners to compel a performance of a parol contract to compensate the party, could not be sustained, on the ground of its not being a valid contract within the statute of frauds; yet this court retained the bill, and awarded an issue of *quantum damnificatus,* to assess the damages sustained by the plaintiff, by the acts of the defendants, as the plaintiff had sustained an injury for which he ought to be compensated, and for which he had no remedy, or, at best, a doubtful and inadequate one, at law.

THE bill, which was filed in *July,* 1809, stated the act of the legislature, passed the 6th of *March,* 1807, entitled " an act to raise moneys to drain the drowned lands in the county of *Orange,*" (sess. 30. ch. 25.) By the first section of the act, three inspectors were appointed to determine the number of acres belonging to each owner of the tract of drowned lands, which, in their opinion, might be benefited in removing the obstructions and straightening the river *Wallkill,* and the two streams which fall into it, in that tract ; and to determine the proportion that each owner should pay, per acre, of any sum of money to be raised for the purpose, and to make a roll thereof, &c.

By the 4th section, *John Townsend, George D. Wickham, Peter Townsend, Moses Phillips,* and *William Thompson,* were appointed commissioners, with full power to remove all obstructions out of the *Wallkill,* &c. ; to deepen, widen, and straighten the same, &c. ; and further, to use and occupy a sufficient proportion of the lands, adjoining each bank of the river, on which they may find it necessary to lay the rocks, stone, earth, &c. ; which they may have occasion to take out of the same, &c. ; and that the commissioners, and their

successors, might contract with the owners of the lands so to be used, for the damages which they might sustain by reason thereof; and in case of disagreement, the damages were to be assessed by three indifferent freeholders, to be mutually chosen for the purpose; and if the owners should refuse or neglect to choose the appraisers, the commissioners might apply to the *Orange* court of common pleas, who were empowered to appoint the appraisers.

By the 11th section, the commissioners, or their successors, or a majority of them, if necessary, in exercise of their powers, &c. might remove or destroy any mill or mill dam, or any other erection or improvements, owned by any person or persons, on the said river, &c. And that all persons sustaining damage or injury, by the exercise of the powers granted to the commissioners, &c. should receive indemnity and compensation for such damage or injury, the commissioners, &c. and the persons sustaining the damage or injury, might treat and agree on the sums to be paid as compensation, &c.; and in case of agreement, the commissioners were directed to pay the sums agreed on out of the moneys coming into their hands under the act; but in case of disagreement between the parties, &c. the persons claiming compensation might apply to the Chancellor, or one of the judges of the supreme court, who was directed to appoint five reputable and disinterested freeholders of the county, to determine the sum, or sums, which ought to be paid a compensation, &c. And it was made the duty of the commissioners to pay the sums, so determined on as compensation, out of any moneys coming to their hands, &c. to the persons entitled to such compensation; and that until such sums should be paid, they should carry interest, and be a *lien* on the lands intended to be benefited by the draining aforesaid, in the nature of a mortgage; and that the said lands might be proceeded against in a court of chancery, as mortgaged premises, as nearly as the nature of the case would

1814.

PHILLIPS
v.
THOMPSON.

admit, and might be sold to raise the sum or sums to be paid.

The bill further stated, that the plaintiff, at the time of passing the act, was owner of land, a dam, and mills, on the outlet of the *Wallkill*; that the commissioners, named in the act, took upon themselves the burthen of their trust, and determined that the plaintiff's dam must be lowered, and a canal cut down to the same, through the lands of the plaintiff; that, about the 23d of *May*, 1807, the commissioners and the plaintiff *agreed*, that the plaintiff should lower his dam *four* feet, by the 1st of *May*, 1808, and should allow the commissioners to cut a canal through his lands, and that the commissioners should pay to him, as a compensation, &c. 6,000 dollars, and the sum of 800 dollars more, if he should lower the dam by the 1st of *July*, 1807; that, in pursuance of this agreement, the commissioners, in the course of the year 1807, cut the canal, but did not request the plaintiff to lower his dam before the 1st of *July*; that he lowered it *four feet*, according to his agreement, in *April*, 1808; that the three inspectors appointed by the act, made an estimate of the number of acres of each owner benefited by the operation, and what sum each ought to pay for such benefit, and filed the same according to the direction of the act; that the commissioners proceeded to assess the said owners of lands, and collected large sums of money, enough to pay the plaintiff the sum of 6,000 dollars, when due; and for which sum the plaintiff has a *lien* on the said lands, in the nature of a mortgage; that the defendants were elected commissioners, pursuant to the act, and acted as such, in 1809, the time of filing the bill, &c. The plaintiff prayed a *discovery* of the moneys collected, the names of the owners of the lands, and a description of the lands bound by the *lien*; and that the defendants might be decreed to pay to the plaintiff the 6,000 dollars, &c.

Two of the defendants, *Jennings* and *Bradner*, who were elected commissioners after the alleged agreement with the

plaintiff, *demurred* to the discovery, and answered to other parts of the bill, denying the original agreement; and stating that the lands were occupied without the consent of the plaintiff; and that, in the spring of 1808, the commissioners lowered the dam, intending to pay a compensation for all damages; and that the mills were previously burnt, &c.

The defendants, *Thompson* and *Peter Townsend*, two of the original commissioners, and who continued in office, in their answer, admitted the ownership of the land by the plaintiff, &c.; that the commissioners determined to lower the dam, but the plaintiff denied their power to do so; that they consented to treat with the plaintiff, and received his *written* propositions, by which he offered, in consideration of 6,000 dollars, to permit the canal to be cut through his lands, and lower his dam four feet by the 1st of *May*, 1808; and that if he might have the right to raise it one foot, when the water was only one foot above the dam, he would accept 4,000 dollars, or 2,500 dollars, if he might raise it three feet, and erect a new dam when the draining was completed; and that, if he should lower his dam four feet by the 1st of *July*, 1807, he should receive the further sum of 800 dollars. That before the propositions were considered by the commissioners, a majority of them had entered into a verbal contract with *Peter Townsend*, one of the commissioners, to execute a large part of the draining, which he agreed to perform in 1807, for the sum of 54,000 dollars; but this work could not be done, unless the plaintiff lowered his dam *four* feet; and the commissioners, therefore, agreed to accept the proposal of the plaintiff to lower his dam by the 1st of *July*, 1807, and entered into a verbal agreement with him for that purpose; and the plaintiff, in consideration of 6,800 dollars, agreed to permit the canal to be cut, and to lower his dam by the 1st of *July*, 1807. That this agreement was precise and positive as to the time the dam was to be lowered, and there was no other agreement, nor any agreement as to lowering the dam by the 1st of *May*, 1808. That on the suggestion of *Moses*

*Phillips*, one of the commissioners, and father of the plaintiff, the parties agreed to reduce the contract to *writing*, and *Moses Phillips*, for that purpose, applied to *David Mason*, to have the agreement in writing, and ready for execution at a meeting of the commissioners to be held in *June*, 1807, for that purpose. At that meeting, a majority of the commissioners, at the instance of *W. Wickham*, a large proprietor of the lands, abandoned the agreement, and changed the plan of operations. No written contract was presented to the commissioners or signed by the parties. That under the new plan of operations, *Moses Phillips*, one of the commissioners, as chief superintendant, took possession of the ground, with the express or implied assent of the plaintiff, and with a mutual understanding that compensation should be made ; but they denied that any thing was done by the commissioners in pursuance, or in part performance, of the verbal agreement ; and that, if any such thing was done by *Moses Phillips*, it was without the assent, intent, or knowledge of the rest of the commissioners. That one of the defendants, *Thompson*, told the plaintiff that the commissioners did not mean to adopt the agreement : that the plaintiff lowered his dam in *April*, 1808, but the mills, before that time, were burnt down. That the damage in taking down the dam was inconsiderable ; that the assessments made on the owners amounted to 26,506 dollars, all of which sum, except 8,000 dollars, had been expended, and that the defendants had no means of collecting the 8,000 dollars, but by a sale of the lands assessed. That the verbal agreement, set forth by the plaintiff, is void by the statute of frauds, &c.

The answer of *George D. Wickham*, another defendant, agreed substantially as to the facts stated in the answer of *Thompson* and *Townsend*, except that he dissented from the agreement with the plaintiff and with *Townsend*. He denied that the commissioners took possession under the agreement ; but that they took possession after the 1st of

*July*, 1807, after a failure of the plaintiff to perform, and under a mutual understanding of compensation, &c.

The following is the substance of such parts of the evidence as it is thought material to state.

A witness, *Moses Phillips*, (one of the commissioners,) on the part of the plaintiff, stated, that on the 24th of *May*, 1807, the commissioners admitted to him, that they had made the agreement as set forth by the plaintiff; and that *Thompson*, the president, and *Peter Townsend*, the secretary, afterwards admitted the same.

*Lemuel Judson*, another witness, proved the confession of *Peter Townsend*, in *May*, 1807, that such an agreement had been made, and that all the commissioners, in *June*, admitted the same, and that *Thompson*, afterwards, in *July* or *August*, and in *December*, 1807, admitted the same thing. *Moses Phillips*, jun., also proved the confession of *Thompson*, in *July*, 1807, and in *May*, 1809, that such an agreement had been made with the plaintiff.

*Henry W. Phillips* proved the confession of *John Townsend*, one of the commissioners, in *May*, 1807, to the same effect.

*John Kinney* deposed, that the commissioners admitted, in *September*, 1807, that the plaintiff was to lower his dam four feet the next spring.

Several witnesses proved the occupation of the ground by the commissioners, the digging the canal, &c. in the autumn of 1807, and in 1808.

On the part of the defendants, a witness, *John Townsend*, who was a commissioner, proved a *verbal* agreement with the plaintiff, that he was to have 6,800 dollars, if the dam was lowered by the 1st of *July*, 1807, and that the contract was to be reduced to writing. He also proved the contract with *Peter Townsend*, which was to be executed by the 1st of *January*, 1808, and which was also to be reduced to writing.

Another witness, *James Moore*, proved a verbal contract

with *Peter Townsend*, in *May*, 1807, which was to be per-
formed by the 1st of *January*, 1808 ; and, that to effect it,
it was necessary that the dam of the plaintiff should be low-
ered four feet. He stated, that the agreement with the plain-
tiff was as set forth in the answer of *Thompson* and *Town-
send*, and that it was made to enable *Peter Townsend* to
proceed in the execution of his agreement, and that both
agreements were to be reduced to writing in *June ;* that the
plaintiff confessed to him that he was bound to lower his
dam by the 1st of *July*, and that after the meeting, in *June,*
the plaintiff said that he was not bound to lower his dam,
unless the commissioners secured to him 6,800 dollars, and
said they were to pay him that sum, provided he lowered
the dam by the 1st of *July.* The witness stated, that the
contract with *Townsend* was abandoned at the meeting of
the commissioners, in *June.*

*Joseph Jefferson*, also, deposed, that he understood from
the plaintiff, in the fall of 1807, that the dam was to be low-
ered prior to the operation of *Townsend's* contract ; and that
the plaintiff was to receive 6,800 dollars.

*William Townsend*, a witness, stated, that, at the meet-
ing of the commissioners, in *June*, he heard *Moses Phillips*
say, that he had taken great pains to have the contract with
the plaintiff completed, and that he had employed *D. Ma-
son* to draw it, and complained of the impropriety of the
commissioners refusing to ratify it. He understood, at that
meeting, that the contracts were abandoned, in consequence
of the opposition of *Wickham.*

*D. Mason* deposed, that, in *June*, 1807, *Moses Phillips*
and *Peter Townsend* requested him to take minutes of the
contract with the plaintiff, in order to reduce it to writing ;
and that he took the minutes according to their directions as
commissioners ; that the dam was to be lowered, by the
plaintiff, by the 1st of *July*, for 6,800 dollars. Minutes of
the contract with *Townsend* were taken at the same time,
and for the same purpose, and were to be executed by the

parties. The minutes were taken on the day of the meeting of the commissioners, in *June;* but the contracts were not completed and furnished by him, in consequence of the advice of *Wickham.* The minutes taken by *Mason,* which were exhibited, stated the contract as set forth in the answer of the defendants.

1814.

PHILLIPS
v
THOMPSON.

Two other witnesses stated, that, at the meeting in *June,* they understood that the contracts were abandoned.

There was a *cross bill,* also, filed and pending.

The cause coming on to a hearing, several preliminary motions were made by the counsel, on each side, to suppress parts of the testimony taken before the examiner as incompetent, and, for that purpose, they entered into a laborious examination of the answers of the witnesses, on each side, to the interrogatories both direct and cross. Many parts of the depositions were struck out, as amounting only to hearsay evidence, or to a loose and general understanding and belief. And in the course of this discussion, it was moved on the part of the defendants, to suppress the whole testimony of *Moses Phillips,* the plaintiff's father, on the ground of misbehaviour in his answers to the 6th, 8th, and 10th cross interrogatories.

*July* 6th.

To oppose the motion, the certificate of the examiner was read, exculpating the witness, and showing that the defect appearing in the answers, was not owing to the want of a full disclosure by the witness, but to the mode of taking the answer down, in which the examiner, in endeavouring to follow the spirit of the 29th rule of *June,* 1806, may have aimed at too much brevity. The following authorities were also cited by the plaintiff's counsel, to show the practice in the case of defective answers given by witnesses, viz. *Wyatt's Prac. Reg.* 419. 172. 1 *Sol. Guide,* 275, 276. 1 *Har. Prac.* 489, 490. 514. 519, 520. 542. *Dickens,* 288. 358. 2 *Ves.* 106.

Practice as to the misbehaviour of a witness in his answers to interrogatories.

*J. Radcliff,* and *Riggs,* for the plaintiff.

*T. A. Emmet,* and *Robinson,* for the defendants.

1814.                THE CHANCELLOR. The motion to suppress the depo-
PHILLIPS      sition of the witness is denied, as the charge of misbeha-
v.           viour is done away; but if it should be deemed material,
THOMPSON.
            hereafter, in the discussion of the merits, to have a more full
July 7th.    and perfect answer from the witness, the court will direct a
            further examination of him, on those interrogatories, either
            before the examiner, or in open court. The cases cited
            show, that either course may be adopted, in the discretion
            of the court, the better to inform its conscience; and if a
            further deposition be taken, it need not be published, nor
            a further argument had, unless the justice of the case should
            seem to require it.

            The counsel for the defendants then raised an objection to
            the answer of *Moses Phillips*, jun., one of the plaintiff's wit-
            nesses, to the 4th direct interrogatory, because he detailed
            the declarations of *Moses Phillips*, one of the commission-
            ers under the act, but not a defendant.

July 7th.            THE CHANCELLOR. The declarations of a person who
Declarations of   is not a party in interest, not a party to the suit, and who
a person not a
party in inte-    is a witness in the cause, are clearly not competent evi-
rest, nor a party
to the suit, and   dence; and that part of the deposition must be suppressed.
who is a witness
in the cause, are
not competent
evidence.           The counsel for the plaintiff then moved, that the answer
            of the plaintiff to the *cross bill*, filed on the part of the de-
            fendants, be read, on the ground that the cross suit was to be
            considered as brought on to a hearing concurrently with this,
            which, they said, was the usual and proper course; and for
            this they cited *Wyatt's Prac. Reg.* 218. *Coop. Tr. Ch.
            Pl.* 87. And they also insisted, that the counsel for the
            defendants having, yesterday, raised the question, as to the
            competency of the deposition of *Peter Townsend*, in the
            *cross suit*, as evidence in this suit, and taken the opinion of
            the Chancellor, who decided that the deposition was in-
            admissible; the motion to the court, for its opinion on that
            question, implied that both suits were on hearing together.

But the defendants' counsel denied that they had moved to bring on the cross suit to a hearing; and insisted that, without their motion, it could not be considered as before the court.

PHILLIPS
v.
THOMPSON

*July* 8th.

THE CHANCELLOR. It is not material to the decision of the present question, whether the cross suit is to be deemed as regularly brought on to a hearing, or not; for the plaintiff cannot read his own answer to the bill of discovery, in the cross suit, unless the defendants choose first to produce it in evidence. The plaintiff cannot testify for himself, unless at the instance, and on the call of the defendants; and it is for the defendants to determine, whether the answer is to be admitted as evidence, in this cause or not. The motion is, therefore, denied.

A plaintiff cannot read his own answer to a bill of discovery, in a cross suit, in evidence, unless the defendant chooses first to produce it.

In arguing on *the merits*, the counsel for the plaintiff entered into a minute examination of the evidence, and contended, that the contract, as stated in the bill, was fully proved; that it had not been rescinded, and had been carried into execution on both sides; that it was no objection that the defendants had no funds in their hands, as they might be directed to collect the money according to the provisions of the act.

*July* 9th.

That this case could not be brought within the statute of frauds; there was no grant, assignment, or surrender, or sale of any interest in lands. It was a mere *easement* A grant of a right of way is not within the statute; and if this agreement was within the statute, it was taken out of its operation by the part performance. The entry of the defendants on the ground, and digging the canal, was a part performance.

They cited, 1 *Schoale & Lefroy's Rep.* 22. 40, 41, 42. 1 *Vesey,* 221. *Sugden's Law of Vendors,* 72—85. 3 *Atk.* 503. *Prec. in Ch.* 560.

*For the defendants,* it was insisted, that, if there was a valid contract, the plaintiff had a clear remedy at law, under the statute; that no contract, as stated by the plaintiff, had been shown; the contract, in the *alternative,* as alleged by

him, and on which he grounds his application for relief, was peremptorily denied in the answer.

There was a great and irreconcilable contradiction in the evidence. The witnesses of the defendants were disinterested. Three of the defendants, in their answers, deny the contract set up by the plaintiff. If a defendant denies a fact charged in the bill, it requires two witnesses to countervail his answer. So, according to the sense and spirit of the rule, if there are two defendants, each denying the same fact, it requires *four* witnesses to countervail their answers. (*Mortimer* v. *Orchard*, 2 *Ves.* jun. 243.) The confession of one defendant, binds him only. (*Wyatt*, 23. 188. But see 1 *Dickens*, 24. 12 *Vesey*, 355.) The evidence of *Mason* and his minutes, are conclusive as to the contract.

But, whatever the contract was, it was abandoned in *June*, 1807; and being *in fieri*, and not completed, or reduced to writing, the defendants had a right to abandon it. (6 *East*, 602.)

Again, the commissioners were bound to pursue the directions of the act, strictly. They had no authority to enter into such a contract. The act never intended, nor contemplated a personal suit or demand. There can be no *personal decree* in this case. A decree under an *illegal* contract will not bind the land, which was ultimately to pay, and this court cannot force an assessment on the land.

Again, the case is within the statute of frauds. (*Rob. on Frauds*, 126. *advertis.* p. 17. 6 *East*, 602.)

The answer peremptorily denies the agreement; and it is not competent to prove the agreement *aliunde*. (6 *Vesey*, 12. 2 *Bro. Ch. Cas.* 559. *Dickens*, 664.) No part performance will be sufficient, unless that part performance was in *pursuance* to the contract, and was such, that the nonfulment of the contract would be a fraud. (1 *Bro. Ch. Cas.* 480. *Mitford*, *Arg.* *Loft*, 808, 809. 7 *Vesey*, 341. 1 *Vesey*, 221. 2 *Bro. Ch. Cas.* 563. 3 *Atk.* 4.

*Ambl.* 586. 2 *Bro. Ch. Cas.* 561. 566. *Arguendo. Sugden's Law of Vend.* 83, 84. (3d ed.) 1 *Schoale & Lefroy*, 41.)

Part of the contract was clearly within the statute, even if the agreement as to lowering the dam was not. If a contract is void in part, by the statute, it is void *in toto.* (*Anst.* 420. 525. 7 *Term Rep.* 281. *Sugden's Law of Vendors*, 64.)

The cause stood over for decision, on the merits, to this day.

The Chancellor. The object of this suit is to obtain a discovery of the funds under the control of the defendants, as commissioners, and to compel them to perform, on their part, the parol contract set forth in the bill. The contract is denied in the answers, and the statute of frauds is also insisted on, and much testimony has been taken on each side, in respect to the contract, and to its part performance.

1. The first question that naturally arises upon the case is, whether the contract, as charged, was a "contract or sale of lands, tenements, or hereditaments, or any interest in, or concerning them," within the 4th section of the *English*, or the 11th section of our statute of frauds, (sess. 10. ch. 44.)

The commissioners, under the act stated in the case, (sess. 30. c. 25.,) were authorized " to remove any obstructions, dam, or erection, mill or improvement, in or across the *Wallkill*, at the outlet of the drowned lands, and to use and occupy a sufficient proportion of lands adjoining each bank of the river, on which they might find it necessary to lay the rocks, stone, earth, gravel, or other substance, which they might have any occasion to take out of the same ; and to take, use, occupy, and enjoy the same, for the purposes aforesaid, and to contract with the owner for the damages," &c. Under this authority the contract is alleged to have been made, and possession of the lands of the

*1814.*

PHILLIPS
v.
THOMPSON.

*August 29th.*

PHILLIPS
v.
THOMPSON.

plaintiff taken ; and I think it must be considered as a con-
tract concerning an interest in lands, within the purview of
the statute of frauds.

I lay it down preliminarily, as a clear principle, that the
commissioners had no legal right to use and enjoy the lands
of the plaintiff, or to remove or destroy his property, with-
out a contract with him, and his assent for that purpose, or
until compensation had been made or tendered, as the act
provided.   The latter was not done, and therefore, a valid
contract was necessary to give them the right.

The statute, under which the commissioners acted, men-
tions that they were " to contract," or to treat and agree,
" with the owner, for the damages or compensation, and to
pay the amount."   The nature and form of the contract is
not defined in the act, and it must be understood to mean a
contract valid by the existing laws of the land.   The statute,
most certainly, did not intend any unnecessary interference
with established principles.   The owner must be a person
of competent age and ability to contract, and the contract,
to be binding, must have the requisite form and substance.
It must be subject to the same rules and construction as all
other contracts of the same nature.   Thus it has been de-
cided, (*Simonds* v. *Catlin*, 2 *Caines*, 61.,) that when a
statute authorizes a sale of lands, it means a sale with the
customary solemnities, and by deed or note, in writing, ac-
cording to the direction of the statute of frauds.

It was said that the right granted to the commissioners, by
the contract charged, was an easement only, and not within
the act.   I have looked into the books ; and with respect to
a right of entry on land for a temporary and special prupose,
and which is sometimes treated as an easement, there are
very subtle distinctions, and much apparent contradiction
in the cases.   Thus, a sale of timber growing, or of potatoes
in the ground, and which had done growing, has been held
to be a sale not within the statute of frauds. (*Anon.* 1 *Lord
Raym.* 182.   *Parker* v. *Stanilard,* 11 *East,* 362.)   But a

sale of grass growing, or of turnips growing, was the sale of an interest within the act. (*Crosby* v. *Wadsworth*, 6 *East*, 609. *Emmerson* v. *Heelis*, 2 *Taunton*, 38.) In one case in the K. B., rather imperfectly reported, (*Wood* v. *Lake*, *Sayer*, 3.,) it was held, that a parol agreement for liberty to stack coals on land for seven years, was but an easement, and not an interest, and so not within the statute. I mean not to meddle with the above cases, except so far as to observe, upon the last, which has some bearing upon this, · that it is justly liable to all the observations against its authority, made by Mr. *Sugden*, (*Law of Vendors*, 3d *Lond.* ed. 56.,) and that the agreement, thereby stated, seems to have been equally within the words, and within the mischief of the act. The contract, in this case, related to an interest to be acquired in the land itself, and to such a possession, for the limited purpose, as would entitle the commissioners to an action of trespass or ejectment, for any injury or interruption to the possession. They were to have the *use and enjoyment* of the land. Unless the contract reached to an interest in the soil, the objects of the act could not be answered, and would be exposed, at all times, to be defeated. The privilege of erecting a mill dam on the bank of a creek, was held, in the case of *Jackson* v. *Buel*, (9 *Johns. Rep.* 298.,) to be an interest for which an ejectment would lie, because an interest was given in the soil, not only for erecting the dam, but for possessing it. So, a contract for the sale, and delivery of possession, has been held to carry with it an interest in the land, and to come within the statute. (*Howard* v. *Easton*, 7 *Johns. Rep.* 205.) With respect to the word tenement, it has been held to reach not only to corporeal inheritances, but to rights annexed to, and to be enjoyed as part of the inheritance; such as rents, tolls, estovers, commons, piscary, &c.; for these all savour of the realty. (*Co. Litt.* 200.) If we resort to either branch of the clause of the statute of frauds, the contract seems to be within it. The use of the outlet of the *Wallkill*, and its

banks, for the purposes declared, and the enjoyment of that use, by the commissioners and *their successors*, was to be as permanent as the improvements intended. The provision was for a public and lasting object, and if the outlet was not kept clear and unobstructed, the lands to be improved might again be overflowed.

2. But the plaintiff alleges a part performance of the contract, to take the case out of the statute. The answers deny the agreement, and any part performance in pursuance of it. This has led the parties into much parol proof; and unless the plaintiff has clearly established the contract, as charged, and, also, a part performance of the same contract, he has not entitled himself to the relief sought.

The proof of the existence of this contract, as charged in the bill, consists of the depositions of *Moses Phillips*, father of the plaintiff, and one of the original commissioners, of *Moses Phillips*, jun., *Lemuel Judson, Henry W. Phillips*, and *John Kinney*, who all prove various confessions of the different commissioners, with whom the plaintiff contracted, of the making of the contract as charged. On the other hand, there are the answers of the defendants, denying any such contract, and the depositions of *John Townsend, James Moore*, and *Joseph Jefferson*, proving a different contract, and one conformable to that alleged in the answers, and which was to be reduced to writing. There are, also, on the part of the defendants, the depositions of *William Townsend* and *David Mason*, proving the application of *Moses Phillips*, in behalf of the plaintiff, to *David Mason*, to take minutes of the contract with the plaintiff, and to reduce it to writing, to be executed, by the parties respectively, at the meeting of the commissioners in *June*, 1807. The minutes so taken by *Mason* are an exhibit in the cause, and they relate to a contract as set forth in the answer, and do not apply to the contract charged in the bill. The testimony, as it respects the quantity of the proof on each side,

may be considered as nearly balanced ; but there are intrinsic circumstances arising out of the nature of the testimony, which inclines the balance in favour of the defendants. The answers of the defendants, who were the original contracting parties, and who were selected by the legislature, for their judgment and character, to execute this public trust as commissioners, who have no personal interest in the question, and who must be presumed to have full knowledge of the contract intended to be made by them, are entitled to, and cannot but receive, very great consideration, in estimating the relative weight and credit of testimony. The original minutes of *Mason*, the attorney, taken down at the time, from the mouth of *Moses Phillips*, the father and agent of the plaintiff, for the express purpose of reducing the contract to writing, and preparing it for execution, ought to have a more preponderating influence than the fallacious memory of witnesses speaking several years afterwards. Written proof, of that kind, always outweighs parol proof, in judgment of law, as well as by its power to produce conviction.

The plaintiff has, accordingly, failed in making out, by clear and satisfactory proof, the existence of the contract as laid.

The evidence on the part of the plaintiff, in support of the allegation of part performance of his contract, as charged in his bill, consists, principally, of the testimony of *John Kinney*, *Gabriel N. Phillips*, *John Rasuin*, and *Thomas Waters*, proving that the commissioners entered on the land, and commenced the canal, in the autumn of 1807, and continued working at it in the year ensuing. The defendants admit this fact, and, also, that the plaintiff lowered his dam four feet in *April*, 1808 ; but they say that the entry and occupation of the land was made with the express or implied assent of the plaintiff, and under a mutual understanding that a compensation was to be made, but not the specific compensation now claimed. There is, likewise, proof, that at the meeting, in *June*, the commissioners refused to execute the contract

set forth in the answers, and, consequently, that no contract was signed; there are, also, other facts in proof, from which we are necessarily led to infer, that this refusal must have been known at the time to the plaintiff. As the contract, whatever it was, rested in parol, and had not been consummated, nor any act done under it, the commissioners clearly had a right to avail themselves of the *locus penitentiæ*, and rejeçt it. It does not follow, then, as a necessary consequence, that the subsequent entry of the commissioners, in the autumn of that year, was in pursuance of the contract charged, nor is it to be reasonably presumed, after that refusal, provided any other good reason can be assigned for that entry. The real motive is obvious, independent of the contract; it was in pursuance of their public trust, and to carry their powers into effect. The 11th section of the act seems evidently to contemplate an entry and exercise of power, being previous to the settlement of compensation; and the 4th section is far from being very clear and explicit on that point. Though I consider it to be a fundamental principle of law, and of good government, that private property cannot be taken away for public purposes, without just compensation, and that, until that is made, the party aggrieved would be entitled to his legal remedy; yet it was very natural that the commissioners should consider the provisions of the act as sufficient for their entry, in the first instance, and that it was safe, or expedient, to leave the question of compensation as a subject of future arrangment with the plaintiff, either by agreement, or by assessment under the act. The grounds upon which the entry was made, as stated by the commissioners in their answer, appear to me to be extremely probable. The entry was, at least, no very decisive and unequivocal evidence of a part performance of the identical contract set up by the plaintiff. It was certainly not such an act done, to use Lord *Hardwicke's* words, " as could be done with no other view or design than to perform the agreement." It would be extravagant to maintain this, when we consider the

authority and objects of the trust under which the commissioners acted.

/ It is not sufficient that the entry and use of the land is evidence of *some* agreement. It must be satisfactory evidence of the *particular* agreement charged, or it will not take the case out of the statute.

/ It is well settled, that if a party sets up part performance, to take a parol agreement out of the statute, he must show acts unequivocally referring to, and resulting from, *that* agreement; such as the party would not have done, unless on account of that very agreement, and with a direct view to its performance; and the agreement set up must appear to be the *same* with the one partly performed. There must be no equivocation or uncertainty in the case. The ground of the interference of the court is not simply that there is proof of the existence of a parol agreement, but that there is *fraud* in resisting the completion of an agreement partly performed. These principles have been recognised in a series of decisions. (*Lacon* v. *Mertins*, 3 *Atk.* 4. *Gunter* v. *Halsey*, *Amb.* 586. *Niven* v. *Belknap*, 2 *Johns. Rep.* 587. *Frame* v. *Dawson*, 14 *Ves.* 386. *Clinan* v. *Cooke*, 1 *Schoale & Lefroy*, 41. *Lindsay* v. *Lynch*, 2 *Schoale & Lefroy*, 1.) These adjudications will fully justify me, by their strong and pointed application to this case, in denying to the plaintiff the execution of the agreement contained in his bill. He has failed in satisfactory proof of his agreement; he fails, also, in showing such acts of performance as are necessarily to be imputed to that agreement, and cannot reasonably be imputed to any other cause.

This case, like many others, shows the utility of the statute of frauds, and the danger of relaxing the sanction of its provisions. I agree with those wise and learned judges, who have declared that the courts ought to make a stand against any further encroachment upon the statute, and not to go one step beyond the rules and precedents already established.

3. But here arises another and serious question, whether

the bill ought to be dismissed.  It is certain that the plain-tiff has sustained injury by the act of the commissioners, and is entitled to compensation ; and the defendants admit, that they entered upon his land and dug the canal, under his ex-press or implied assent, and with a mutual understanding that compensation should be made.  How is the plaintiff, then, to obtain compensation ?   He cannot, perhaps, for the lowering of his dam, in the mode provided by the 11th sec-tion, for it was his own voluntary act, not that of the commis-sioners ; and he might meet with insuperable difficulties in an action of trespass at law, for entering to cut the canal, as the entry appears to have been with his assent, and seven years have elapsed since it was made.  This case, then, presents peculiar and strong claims for the interference of this court, in securing to the plaintiff a due and adequate compensation.  In *Clifford* v. *Brooke*, (13 *Ves.* 131.,) the bill could not be sustained on the ground of fraud or mistake, and the relief prayed for was in the nature of damages.  The Chancellor observed, that if, in dismissing the bill, *he were to exclude the plaintiff from all remedy, he should pause upon the decision ;* but he concluded that the plaintiff might bring an action at law for his damages.  I have no doubt of the jurisdiction of this court over this case, and that it can cause the damages to be assessed, either by a reference to a mas-ter to inquire into, and report them, or by an issue of *quantum damnificatus*.  The case of *Denton* v. *Stewart*, before Lord *Kenyon*, when Master of the Rolls, was to this effect.  (1 *Fonb.* 38. n. *y.*, and 165. n. *b.*, and 1 *Ves.* jun. 329.)   That case was, afterwards, approved and followed by Sir *William Grant*, in *Greenaway* v. *Adams*, (12 *Ves.* 395.)   In both those cases, which were bills for specific performance, the defendant had put it out of his power to perform the contract, and the court retained the bills, and referred it to a master to assess the plaintiff's damages.  This appears to me to be a case under similar circumstances, and as proper as any that can arise for the

application of the principle of those decisions. Justice de-
mands that the plaintiff should have relief, and I am apprehen-
sive he would be remediless without the aid of this court.
The cases are numerous in which the court of chancery has
caused damages to be assessed, either by an issue or by a
master, at its discretion. (2 *Fonb.* 441. *Hedges* v. *Eve-
rard*, 1 *Eq. Cas. Abr.* 18. pl. 7. *Cudd* v. *Rutter*, 1 *P.
Wms.* 570. *Errington* v. *Aynesly*, 2 *Bro.* 341.) I believe
the more usual course, where the damages are not a matter
of mere computation, is by awarding an issue, and, under
the circumstances of this case, I deem it the more advisable
method.

I shall, accordingly, retain the bill, and award an issue of
*quantum damnificatus*, to assess the damages which the
plaintiff has sustained by the entry and acts of the commis-
sioners, and by his own act in lowering his dam, which was
a consequence of their directions; that the issue be tried
at the *Orange* circuit, and that all further questions be re-
served until the return of the *postea* on such issue.

After the damages are assessed, I apprehend no difficulty
in finding means to enforce payment. It is made the duty
of the commissioners to assess and pay the damages to be
sustained. It is part of their trust, and the sum becomes a
*lien* on the lands that are to contribute.

The following decree was, thereupon, entered :

" That the plaintiff ought to receive, from the defendants
in this suit, or their successors in office, the damages sustain-
ed by, and compensation due to, him, by reason of lowering
his mill dam across the *Wallkill*, in the bill mentioned, at
the time the same was done ; and, also, by reason of the
defendants, their predecessors, or successors in office, enter-
ing upon, using, and occupying the lands of the plaintiff, for
digging a canal, and otherwise, as the same may have been
used for the purpose of draining, or to facilitate and assist in
draining, the drowned lands, in the pleadings mentioned.
But, inasmuch as it does not satisfactorily appear to the

1814.

PHILLIPS
v.
THOMPSON.

court, that any agreement has been made by and between the parties, as to the amount of such damages and compensation, to the end, that the same may be satisfactorily ascertained, it is further ordered, adjudged, and decreed, that an issue be made up between the parties, to ascertain, by the verdict of a jury of the county of *Orange*, the amount of such damages and compensation ; that the said issue be tried at the next, or any subsequent circuit in the said county ; that, for the purpose of forming a proper issue for the assessment of the damages and compensation, to which the plaintiff is declared to be entitled as aforesaid, the plaintiff shall declare, in *assumpsit*, that the defendants promised to pay him as much as he reasonably deserved to have for his said damages and compensation, or to that effect; and to which declaration, the plea shall be *non assumpsit ;* on the trial, the plaintiff shall not set up any agreement between him and the defendants, or their predecessors in office, as to the amount of damages and compensation ; and the defendants shall admit their assumption to pay the plaintiff so much as he reasonably deserved to have as damages and compensation, for lowering his mill dam, by the defendants' request, and for their accommodation, as commissioners for draining the drowned lands, and for the defendants, or their predecessors, or successors in office, entering upon, using, and occupying the lands of the plaintiff, as aforesaid ; and the jury are to allow, in their assessment of damages, interest upon the amount of the damages they may find, for such damages and compensation, from the times when the several acts were done, for which the plaintiff is declared to be entitled to damages and compensation as aforesaid, to the time of rendering the verdict ; and that all further directions be reserved until the said issue shall be tried, and the *postea* returned to this court."