OF THE

## STATE OF NEW JERSEY,

### ON APPEAL FROM THE COURT OF CHANCERY,

AND PREROGATIVE COURT.

MARCH TERM, 1892.

---

ANN M. LAWRENCE, appellant,

*v.*

CHARLES L. SPRINGER and WILLIAM H. SPRINGER, respondents.

| 49 | 289 |
| 51 | 268 |
| 49 | 289 |
| 52 | 667 |
| 49 | 289 |
| 55 | 77 |
| 49 | 289 |
| 56 | 480 |

1. It would seem that an easement cannot be, in this state, imposed on land by the force of parol evidence.

2. A license executed at the expense of the licensee will not have that effect.

3. Even in jurisdictions in which such a doctrine prevails it must be shown that the damage to a licensee by a revocation of the license would be both considerable and irreparable.

---

On appeal from a decree advised by Vice-Chancellor Pitney, whose opinion is reported in *Springer v. Lawrence, 2 Dick. Ch. Rep. 461.*

19         [289]

Lawrence v. Springer.

*Messrs. Martin P.* and *S. H. Grey,* for the appellant.

*Mr. A. H. Swackhamer* and *Mr. D. J. Pancoast,* for the respondents.

The opinion of the court was delivered by

BEASLEY, C. J.

The facts necessary to the intelligibility of the views to be expressed can be stated in a few words.

There are three several tracts of land in the county of Gloucester, lying along the Delaware river. A part of each of these consists of meadows that were injuriously affected by the flow of the tides, so that in the year 1851 commissioners were appointed under the act (*Rev. p. 642*) to enable the owners of meadows to improve the same. By force of that proceeding certain embankments, drains and sluices were established and an apportionment of the expense of constructing and maintaining them was duly made. That this course of law was and is legal no one disputes. Of the three tracts thus improved the respondents, who were complainants in the court below, are at present the owners of the central one and which is drained on one side through the property of the appellant, and on the other through that belonging to one Beckett, who is not a party to this suit.

This being admittedly the legal situation, some years ago the respondents, being minded to reclaim other parts of their low lands, removed the bank on their property erected by the commissioners nearer to the river, so as to take in about twenty-five acres of additional meadow, and thereby at least doubled the acreage of their farm to be drained. By means of subsidiary drains laid in the superadded land thus reclaimed, they carried the water from it into the drains laid by the commissioners, so that thereby part of such water is carried and discharged through the property of the appellant, and the remainder through that of Mr. Beckett, above named.

The question, therefore, from this attitude of affairs, necessarily arose, by what right did the respondents burthen the land of the appellant with the passage and discharge of this super-added water? It was undeniable, and was therefore admitted, that it was not, in any degree, by force of the action of the statutory commission, for it was the consequence of a radical alteration of that plan and adjustment. What the respondents claimed was and is an easement—that is, the right, in favor of their own lands, to discharge this water on to and through the lands of the appellant. There was no contention that they possessed a deed or writing granting to them such right, but their contention was that the appellant had orally consented to the imposition of this burthen on her land, and that in reliance on such assent they had incurred certain expenses in erecting their bank and drains, and that, as a consequence, she would not in equity be permitted to recall her license. This view was sustained in chancery, and the appellant was enjoined from stopping the flow of this water over her land as she threatened to do.

It will be observed that the inquiry thus supervening involves the difficult and troublesome problem as to what extent, and under what circumstances, a court of equity will disregard the well-established rules of the common law, as well as the plain provisions of the statute of frauds, in the establishment of a servitude of this kind.

In the present instance, the proposition upon which this decree has been founded is this: that a parol license, without any consideration moving to the licensor, operating as a part of an easement, is irrevocable in equity where the licensee has gone to expenditures in the erection of structures on his own land in pursuance of such authority.

In the sequel it will become requisite to consider how far this formula, even in its extremest latitude, will support the decree before us in its application to the facts of the case; but before approaching that inquiry it seems necessary, in order to avoid misconception on the subject, to consider whether the equitable principle thus propounded has any place, and, if so, to what extent, in the legal system of this state.

It has not been, and it cannot be, denied that such a grant as the one in question cannot be enforced in a court of law ; such easements, being incorporeal, lie in grant, and their creation requires an instrument under seal.     Nor is it questioned, nor questionable, that a parol imposition of a servitude of this kind upon land is in flat contradiction of the statute of frauds.     It is true, indeed, that in one class of cases, as is well known, courts of conscience have felt dispensed from putting in force the provisions of that act.     This has been the course pursued where a parol agreement for the purchase of lands, or of some interest in them, has been performed to the extent of possession having been taken in part execution of such contract.     But while this is the undeniable rule in equity, it should be ever borne in mind that its introduction has been regretted by the wisest judges.     " The statute," says Lord Redesdale, " was made for the purpose of preventing perjuries and frauds, and nothing can be more manifest to any person who has been in the habit of practicing in courts of equity than that the relaxation of that statute has been a ground of much perjury and much fraud.     If the statute had been rigorously observed the result would probably have been that few instances of parol agreements would have occurred. Agreements from the necessity of the case would have been reduced to writing.     Whereas, it is manifest that the decisions on the subject have opened a new door to fraud."     And these strictures are pointed with the emphatic declaration that " it is, therefore, absolutely necessary for courts of equity to make a stand and not carry the decisions further."     *Lindsay* v. *Lynch, 2 Sch. & L. 4.*     And in the same vein Judge Story (*2 Story Eq. Jur.* §. *766*) says that

" Considerations of this sort have led eminent judges to declare that they would not carry the exceptions of cases from the statute of frauds farther than they were compelled to do by former decisions."

To the same purpose are the criticisms of Chancellor Kent in *Phillips* v. *Thompson, 1 Johns. Ch. 149,* and of Chancellor Zabriskie in *Cooper* v. *Carlisle, 2 C. E. Gr. 529.*

That the exception to the statute must be greatly amplified if it is to embrace and validate the parol contract in the present instance is entirely manifest.   Indeed, it may be said that after such an extension it would scarcely be susceptible of further enlargement.   When A permits B to build a house upon his land, the situation almost necessarily implies the existence of some contract which is thus partly performed between them ; to some extent, therefore, such a matter does not rest absolutely in parol, and the area of possible fraud or perjury is therefore thus circumscribed and hindered.   But when B from his own land turns his water into the drains on the land of A, the situation does not imply a contract.   On the contrary, the situation denotes simply a trespass ; consequently, the existence and character of the contract, if one exists, is the pure creature of parol testimony.   So wide would be the principle of such an impairment of the statute that it is difficult to see how it could be circumscribed.   It would seem to be applicable to the creation of every species of easement.   For example, all rights of way, all rights to light and air, the right to discharge impure water or smoke and noisome smells, and other incorporeal rights of the same kind, could, in most cases, be established by the unassisted force of parol evidence.   Plainly, the principle is of great consequence, and the question is whether it prevails in this state.

In responding to this question in the affirmative, the experienced and able vice-chancellor, who decided this case, relied upon two recent opinions in the court of chancery as containing the equitable rule now applicable, and which has been already expressed, and in addition to these was cited the case of *The Raritan Water Power Co.* v. *Veghte, 6 C. E. Gr. 463.*   This last case was decided in this court and rests upon satisfactory grounds, but its applicability in the present instance is not perceived ; then this court was called upon to test the equitable efficacy of a written license under certain conditions ; now it is to pass upon an oral license under very different conditions.   The language of the opinion must be construed with relation to the facts then under consideration.   In the reported case the statute of frauds was not a factor influencing the determination, while on the

present occasion it is one of prime importance.     The two cases
do not stand upon the same common basis.

The two English cases cited appear to be equally alien from
our present subject.     One of these is that of the *Duke of Devon-
shire* v. *Elgin, 14 Beav. 530,* and it is entirely plain that the
circumstances called for the application of a rule altogether
unlike the one now in question.     In his opinion in the present
case, the vice-chancellor describes this as an instance " of a parol
license to maintain a water conduit across the licensor's land to
supply a village with water ; " but the fact that the equitable
effect of such an unwritten authority, intrinsically considered,
was not in any degree passed upon, appears to have escaped
observation.     In the reported case the answer admitted the
agreement, and it was so found, the chancellor saying :  " I am
of opinion that the passages read from the answer show that
there was a parol agreement to allow the water-course to be made
through the defendant's land, in consideration of payment of a
reasonable sum," and, consequently, works that had been built
in reliance on such an admitted contract were not permitted to
be disturbed.     It is obvious that the point under consideration
was not in anywise decided.

The other English authority relied on is that of *Mold* v.
*Wheatcroft, 27 Beav. 510,* but the briefest statement of the facts
of that case will serve to show that the rule controlling them
cannot be of any concern in our present inquiry.     It is true, as
the vice-chancellor says, that this " was a case of a right of way,"
but such a description is not complete, for it was a right to a
railway that was in question.     The defendant being invested by
act of parliament with the power to lay a railway over the com-
plainant's land, paying a reasonable compensation for such privi-
lege, had entered upon such property with the assent of its
owner, and made the construction in dispute ; it was, therefore,
a case plainly within the equitable rule already stated, of a parol
agreement for the purchase of an interest in land and an entry
and possession by force of such an agreement ; and there was
also parliamentary authority to do the act consented to.     In
short, the case is identical in all its essential features with that

of *The Trenton Water Power Co.* v. *Chambers, 1 Stock. 471.*
It certainly cannot be necessary to pause for an instant to point
out the dissimilarity between such a conjuncture and the one
now being considered.

· The result seems to be that neither of the cases cited in the
opinion of the vice-chancellor from the opinions of the English
chancellors supports in any noteworthy degree the rule embodied
in the decree now before this court. Nor has it appeared from
my own researches in that field that there is to be found any
authority directly upon this question ; but in making this remark,
it should be said no stress is laid on the two cases which are to
be found in *2 Eq. Cas. Abr. 520,* although in the State of Penn-
sylvania they appear to have had a decided effect in leading to
the promulgation by the courts of the doctrine now under criti-
cism. The book referred to is of slight repute, and it alludes
to, rather than reports, these two judicial resolutions. The first
of them is contained in six lines, stating that A diverted a water-
course which put B to great expense in laying of sooths &c.,
and the diversion being a nuisance to B he brought his action,
but an injunction was decreed upon a bill exhibited for that
purpose, it being proved that B did see the work when it was
carrying on, and connived at it without showing the least dis-
agreement, but rather the contrary. *Short* v. *Taylor*, in Lord
Somers's time, was cited, which was this : Short built a fine
house ; Taylor began to build another, but laid part of his foun-
dation on Short's land. Short seeing this, did not forbid him,
but, on the contrary, very much encouraged it ; and when the
house was built he brought his action, and Lord Somers granted
an injunction.

It will be observed that this case of *Short* v. *Taylor* was cor-
rectly disposed of, for the facts do not seem susceptible of other
than one of two interpretations, viz. : that Taylor took possession
of the land in question with the assent of Short, in which event
it was a license executed by possession, which would be enforce-
able in equity according to the established rule ; while the other
case, from the insufficiency of its disclosures, is unintelligible in
any reasonable sense, as it is not shown that the licensee had

incurred any expense or would sustain any damage in consequence of the revocation of the authority to divert the water.

With respect to the state of the law in this country on this subject, it is sufficient to say that it exhibits much contrariety of judicial opinion. A copious collection of such authorities will be found in *13 Am. & Eng. Enc. tit. "License" 550,* and in the text of that work it is declared that "in most of the states it has been held that even where money has been expended by the licensee on the faith of the license, the licensor may exercise his power of revocation." And, indeed, Professor Pomeroy himself, although his work on Specific Performance is cited by the vice-chancellor in the support of the doctrine of the irrevocability of parol license of this kind, after referring to such principle as prevailing in certain jurisdictions in this country, concludes with the decided declaration that "this rule is undoubtedly opposed to the common law doctrine concerning licenses as it prevails in England and in most of the American states."

In this view I concur, and shall conclude this succinct examination of the subject with the remark that if the principle that licenses of this character are to be, under the conditions in question, treated as irrevocable, the same principle, if logical reasoning is to be maintained, would, of necessity, have to be extended so as to control most of the regulations of the statute of frauds &c. If a parol license, inefficacious by force of the act, should be rendered efficacious by reason of a losing part performance on the side of the licensee, it would be difficult to refuse, on a like ground, to apply a similar quality to a sale of goods equally within the statutory condemnation. Suppose A., a merchant, should, by parol, purchase a cargo of merchandise of B, to be delivered at a certain day, and, trusting in such agreement of sale, should, to the knowledge of B, proceed at great expense to procure a vessel and prepare it for the voyage, would such sale be enforceable either at law or in equity? In such case it would not be pretended that by reason of part performance and great loss a practicable equity would arise, and yet how, in point of principle, is such supposed case distinguishable from that of one of these licenses after part performance by the licensee? The

Lawrence v. Springer.

fact is, that a statute that renders legal the revocation of certain classes of contracts is founded on the theory that while, by its force, great losses will many times fall upon promisees, nevertheless such losses must be endured by such sufferers in order that the mass of the community shall be protected against worse disaster. When the legislature has declared that, in general, with respect to certain subjects, there is great danger of fraud and perjury if parol evidence be received, how is it competent for a court to declare there is no such danger in particular instances of such subjects? What reason can be assigned why, in the present case, this appellant should not be protected against the danger of fraud or perjury, which the statute assumes is imminent in such cases?

My general conclusion is that servitudes cannot be imposed upon land by parol transaction, except to the extent above indicated, as evidenced by the ancient decisions in the English chancery, and that our own courts should not extend that limit.

But whatever views may be entertained by others on this subject, it is still, as it seems, demonstrably clear that the decree before this court cannot be sustained.

Whether the broad rule adopted in the court below, or the narrow one just indicated, be applied for present purposes, the result must be the same, for the proofs do not make either rule effective in favor of the respondents.

Nothing is clearer or more settled than that in all cases in which any court has validated an encumbrance imposed upon land by force of a parol contract, that such contract has been required to be proved to the point of demonstration, and that the repudiation of it would work irreparable injury. Both these essentials are wanting to the affair before the court.

In the first place, there was no such proof as that just indicated as to the existence of the alleged license.

Such fact was attempted to be proved in two ways—*first*, by showing an express consent to the easement by the agent of the appellant, and, *second*, by the circumstance that the appellant saw the structures building on the respondents' land and remained silent.

On the first head, it is insisted that the son of the appellant, being her agent, gave the license in question. But the testimony in this particular is conflicting, and leaves the matter in much doubt. The son of the appellant explicitly denies that he consented to the use of the appellant's land as claimed. This denial is controverted by one of the respondents, who is supported in some degree by the other. The preponderance of proof, if it exist, is but slight and indubitably falls far short of that measure of evidence which, in these cases, has always been deemed requisite. According to Professor Pomeroy, on such occasions as this, the most "certain and unmistakable evidence" is inexorably demanded, and it is manifest that this requirement is not fulfilled by the above stated evidential contradictions that are nearly in equipoise.

Also, on the assumption that the agent of the appellant granted the license in question, still the case of the respondents is fatally defective, because it clearly appears that their expenditures were not made in reliance upon such license. In the entire line of cases on this subject it is believed that in no instance has relief even been extended to a licensee who has failed to show that he has incurred large expense in the confidence that his license would not be revoked. In the instance in hand the license that is set up was given when the entire work on the respondents' land was, in the language of the vice-chancellor, "nearly finished," so that the expenses afterwards incurred were plainly trivial. Under such circumstances it has never been claimed, nor can it reasonably be claimed, that there is even a colorable basis for the respondents' bill, for if they did not make their outlays because of the assurances or promises of the appellant, how is it that the latter is to be estopped from asserting her legal rights?

But, further, even if the foregoing considerations should be waived, the respondents' case is, as it is deemed, wholly defective, for if we assume that the son of the appellant gave the license in question, it is plain that such grant was nugatory, for in that respect the son was not the agent of his mother. Nothing can be clearer than this latter proposition, for the entire proof of

agency consisted in a statement made by the son in an affidavit annexed to the answer of his mother in this case, "that he had been her agent for more than twenty years in the conduct of the business relating to her meadow lands," and in his answer to a question when examined as a witness that he had "had the oversight of the farm." This is the entire evidence with regard to this agency and its scope, and it is therefore confidently believed that no one versed in the law will assert, when the situation is pointed out, that such an authorization enabled the son to impose on his mother's land a permanent servitude for the benefit of her neighbor. This fatal imperfection in the case of the respondents appears to have escaped attention in the court below; but as the defect does not reside in mere technical considerations, but in the fundamental equities of the case, it cannot now be overlooked. The respondents are clearly disentitled to the right which they assert unless such right was conferred upon them by the appellant; it is not pretended that they had any personal communication with the appellant herself. Their entire claim is that her son, in express terms, conferred upon them the right in question, and, as is now shown, it is made to appear that the son was destitute of all legal power to do such act, no force whatever is left in their case either in law or in equity. The subject seems too plain for discussion. It is quite common to commit farm lands to the management of superintendents, and to judicially declare that such general authorizations confer upon such agents the power to create easements in the lands so put in their charge would introduce a doctrine that would be in the highest degree both impolitic and novel. In our opinion, according to the proofs before us, this son of the appellant had no more right to impose this servitude on his mother's land than he would have had to mortgage it for the convenience of one of her neighbors.

As to the suggestion that the appellant saw this work progressing, and encouraged, by her silence, such expenditures, and is therefore equitably estopped from making her present contest, the answer is, that assuming that the result thus asserted would ensue from such conduct, we think it clear that the proofs before us do not lay any foundation for the contention. There is

not a particle of direct evidence to evince that the appellant knew that this work was being done, and the only indirect evidence to that effect is, that the house in which she lived was within about half a mile off, so that if she had looked she would have seen what was going on. At the time of the trial it appeared that the appellant was over eighty years of age and was infirm in body; it is not pretended that her attention was called to the subject, so that it is only by way of a conjectural inference that she can be charged with a knowledge that the embankments in question were erecting, and to impute such knowledge to her, what does it signify? If we say she saw her neighbor putting up certain banks on his own property, how did that act intimate to her that it was his purpose, as a necessary incident to the work in progress, to invade her own property? From the evidence it appears that it was at least practicable to drain this newly reclaimed land directly into the river, without bringing any part of its water on to the property of the appellant; can it be said, therefore, that it is reasonable to infer that, looking at these improvements at the distance of half a mile, she must have known what was in the mind of the respondents with respect to a system of drainage? But further than this, even if she had at the time been informed that it was in contemplation to subject her property to the servitude of being used as a drain for these reclaimed meadows, nevertheless she plainly would not have been chargeable with a knowledge that it was their purpose to accomplish such end without her consent and without legal procedure. We shall presently see that the respondents had the option of establishing a drain over the land of the appellant in a mode entirely legal, or, as they have done, in a mode entirely tortious; consequently, it would be most unreasonable to say that the appellant must have been prescient that they would adopt not the lawful, but the tortious method, and that thereby, impliedly, she sanctioned such trespass. We think it incontestible that the appellant did not, reading the case in the evidence before us, give the license in dispute, nor was her conduct such that the respondents had the right to infer that she had done so.

Lawrence v. Springer.

As a last consideration, it is proper to say, that if we were to adopt the doctrine prevailing in those jurisdictions, already alluded to, that these parol licenses are legal and irrevocable, and were to postulate that the license in this instance was given by the appellant, and that the respondents have, in good faith, expended their moneys in reliance upon it, nevertheless it would not seem to us that the respondents would have even the semblance of a stable footing in this case. The reason of this conclusion is this: that the principle that has been supposed to justify the interference of equity in this class of cases is, that without such aid the licensee would sustain irreparable loss. This is the fundamental consideration infusing with a supposed equity every decision of this class. It is not observed that any court has ever interfered in any instance unless upon the ground to protect the licensee from considerable and irreparable damage.

This essential feature is wanting in the instance now in hand. The revocation of this assumed license could not operate disastrously to the interests of the respondents. The remedy was in their hands; all they had to do was to apply under the Meadow act and they would have obtained, in substance, all the relief that has been afforded them by force of the present decree. There was, on their own showing, no necessity to call a court of equity to their aid. Their remedy at law was complete; it has never heretofore been claimed that a parol license of this nature can be sustained and enforced in a case in which its revocation will work no essential damage to its possessor.

The decree should be reversed, with costs to the appellant in both courts.

*For affirmance*—None.

*For reversal*—THE CHIEF JUSTICE, DEPUE, REED, SCUDDER, VAN SYCKEL, BOGERT, BROWN, CLEMENT, KRUEGER, SMITH, WHITAKER—11.