Judge Carr:
This is a bill for the specific execution of a parol agreement for land, upon the ground of part performance. The answers deny the agreement, and the acts of part performance. Before entering into the particular merits of the case, I may be permitted to make one or two general remarks on the subject.
A service of twelve years in the Court of Chancery, brought before me many bills for the specific execution of parol contracts for land; and my experience has convinced me, that the statute of frauds and perjuries was founded in much wisdom; and that the latitude which Courts of Equity have taken, in relaxing its operation, has been productive, on the whole, of more evil than good. By the constant struggle they have kept up, (until these latter days,) to take cases out of the statute, they have let in many of the mischiefs which it was intended to exclude. ■ The ablest Chancellors on the English bench, have felt and lamented this. I might quote many of their remarks to this purpose; but I will content myself with a single one. In *245 Linch v. Lindsey, 2 Sch. & Lefr. 4, Lord Redesdale says, “I am not. disposed to carry the eases which have been decided, on the statute of frauds, any further than I am compelled, by former decisions. That statute was made for the purpose of preventing perjuries and frauds, and nothing can be more manifest to a person who has been in the habit of practising in Courts of Equity, than that the relaxation of that statute, has been the ground of much perjury and much fraud. If the statute had been rigorously observed, the result would probably have been, that few instances of parol agreements would have occurred. Agreements would, from the necessity of the case, have facen in writing; whereas, it is manifest, that the decisions have opened a new door to fraud and that, under pretence of part execution, if possession is had in any way whatever, means are frequently found, to put a Court of Equity in such a situation, that without departing from its rules, it,feels itself obliged to break through the statute, I remember it was mentioned in one case, in argument, as a common expression at the bar, that it had become a practice to improve gentlemen out of their estates.” With these remarks, I proceed to the discussiyn of the case before us.
It is the uniform language of the books, that every bill calling for the exercise of this extraordinary jurisdiction of Equity, is an application to the sound discretion of the Court. It is not a case requiring the interposition of the Court ex debito justilioe, but rests in their discretion, upon all the circumstances. As Lord Eldon observed, 13 Ves. 331, 6e The jurisdiction is not compulsory upon the Court, but the subject of its discretion. The question is not, what the Court must do, but what it may do, under the circumstances.” There are many cases, in which the Court refuses its aid; declaring, at the same time, that there is no ground for rescinding the contract; and leaving the party to make the most of it at law.
*246 I think there are four sound objections to the interference of the Court, in this case: 1st The uncertainty of the agreement. 2d. The time suffered to elapse before filing bill. 3d. The harsh and injurious operation of a specific execution. 4th. That the acts of part performance all lie in compensation.
It is incumbent on every party who brings his case before a Court, to state it with reasonable certainty, and to prove it as stated; and this is peculiarly necessary, upon a bill for a specific performance. For, as the exercise of this jurisdiction rests solely on the ground of attaining more complete justice than the law can render; if there be any material difference between the allegations and the proofs, any uncertainty, vagueness, or ambiguity in the contract, the Court, not seeing its way clearly, is not called, in the exercise of its discretion, to act, and leaves the party to his legal remedy. There are many authorities to this point. In Legh v. Haverfield, 5 Ves. 452, the bill was for specific performance. The agreement, as stated in the bill, was not admitted in the answer; but it was proved by one witness, while letters of the parties, produced in evidence, stated it differently. Bill dismissed for the uncertainty of the agreement. In Harnett v. Yielding, 2 Sch. & Lefr. 549, Lord Redes dale says, “I think it important that this should be considered, because the true foundation on which a party is to be charged specially upon the contract, is, that he has knowingly entered into the engagement, which is sought to be executed; and if the terms are ambiguous, it is impossible for the Court to say that he has done so. The Court cannot be certain of doing justice, when it acts on such contracts; and it is better even for avoiding fraud, to suffer the party to escape out of a contract which he may have intended to make, where it is so ambiguously expressed, than to attempt to enforce it, on a conjecture, that such was the intent of the parties.” In Cooth v. Jackson, 6 Ves. 34, the agreement stated in the bill, was, that there were two tracts of land in contest be *247 tween the parties, and they agreed to a compromise; the plaintiff to have the small tract, and so much of the large one, as, by valuation of arbitrators, would make an equal division. The answer acknowledged, that there was to be an equal division of the two tracts, but did not admit that the plaintiff was to have the small tract. The evidence differed as to that point. This would seem (if a Court could weigh such matters,) but a trivial difference; but Lord Eldon asks, “what right has the Court to say there is no substantial difference in an agreement, composed of these different terms ? If the plaintiff could make out that it was part of his bargain, that he was to have the one farm, the Court has no authority to enquire whether the ground of that is pretium affect ionis, or not. It is his contract.” Again, he says, “Which agreement am I to execute ? The agreement proved, and the agreement admitted, are very different in their terms. The one leaves it to the arbitrators to divide as they please; the other compels them to farm particular lots. Do you remember any case, (he asks the bar,) in which the bill admits one agreement, and the answer admits a different agreement, and the plaintiff proves another agreement different from either, and that has been performed ?” In the same case, Lord Eldon says, “If the plaintiff’s title to relief stands both upon the fact of a parol agreement and part performance, there must be proof that there was a parol agreement, and a part performance, by which I mean, some parol agreement, certain and definite in its terms, and to which these acts of part performance can bo clearly and certainly referred.” In Philips v. Thompson, 1 Johns. Ch. Rep. 131, the Chancellor considers it well settled, that if a party sets up part performance to take a parol agreement out of the statute, he must shew acts unequivocally referring to, and resulting from, that agreement; such as a party would not have done, unless on account of that very agreement, and with a direct view to its performance; and the agreement set up must appear to he the same with the. one partly performed. There must *248 be no equivocation. In the same volume, 284, he says, “The general language of the books is, that part performanee will not take a parol agreement out of the statute, un^ess the terms of the agreement distinctly appear, or are made out to the satisfaction of the Court; and, it is undoubtedly the sound doctrine, though there may be sometimes a ease or dictum, which seems to impair it;” and he quotes many cases in support of his opinion. Let us now examine the record, as to the agreement.
The bill states it with great particularity: that Anthony had contracted with Terrell, for the purchase of the land, at 1800/. that Leftwich being informed of the purchase, agreed to pay half the purchase money as an advancement to his daughter: that afterwards, Leftwich proposed a change (to which Anthony acceded) by which he was to receive the deed for the land, to pay the whole purchase money, (1000/. thereof to be considered an advancement,} and for the re-payment of the 800/. he was to receive the crop made by Anthony, the year before the purchase; to hold the land and Anthony’s slaves, fee. on the plantation, for five years, if it should take so long to re-imburse him; and at the end of that' time, whether he had raised the 800/. or not, should give possession of the whole land to Anthony, and make him a deed. This is the contract in the bill.
The answers deny the existence of any contract. What is the contract proved by the witnesses? No witness is produced, who heard the agreement made,' or any conversation between the parties, on the subject. The whole evidence is derived from loose and casual observations and remarks of Leftwich to different persons; generally, words thrown out, almost at random, in the current of conversation; the speaker having no motive for particularity or accuracy, aud as often misundersiood, or indistinctly remembered, by the hearer, who has no interest to impress the subject on his mind. The security of mens’ estates ought not to rest on a basis, so frail and unstable as this. Nor *249 tuuid it, if the Courts had not u almost cancelled” the statute.
But what say the witnesses ? I mean those of the plaintiff. Hundly says, Leftwieh told him he was to pay 9001. (not 1000/.) towards the land, by way of advancement to his daughter; and to raise the residue of the purchase money, he was to have the use (not of the whole tract, as stated in the bill,) but of the part below the Cowhide branch, and the use of Anthony’s hands, for five years; then to convoy the whole.
West says, that not long after Leftwieh bought the land, lie told him he was to pay 900/. and to have the benefit of Anthony’s hands six (not five) years, to work the land; after that, the land to be Anthony’s.
JCeiger says, Leftwieh told him they gave 1800/. for the land; he was to pay 900/. and Anthony to pay the balance; and in order to raise Anthony’s part, he (Leftwich) was to have the plantation and Anthony’s hands, till the same was raised. In answer to a question asked by the plaintiff, this witness says, that after his return from the western country, (which was in 1810 or 11,) Leftwieh told him, he had not made Anthony a right, but when the 900/. were paid, he would, or would leave directions in Ms will.
Kelly says, Leftwieh told him he had given his daughter 900/. and was to have Anthony’s negroes, till the. other 9001. were made.
Weahs says, he was engaged in hauling tobacco from the plantation on which Anthony lived: that Leftwieh told him he must mark the hogsheads, and he did mark them. He said the reason he marked them was, that he was bound for the purchase money of the land, and he was to give Anthony 1000/. and was to have the benefit of Anthony’s crops, to pay the balance (without limitation as to time) and ilia land was to be Anthony’s.
These are the plaintiff’s witnesses. There are others, whose evidence I do not think it material to state. Not *250 one of them all, agrees exactly with the bill, in stating the contract; unless indeed, we except Dobyns, whose evi~ deuce, I rather think, ought to be rejected; both on the score of irregularity and of interest. But these are questions, which I have not thought it worth while to examine; as his evidence, if admitted, would not change my opinion.
I will only further notice one of the defendant’s depositions. It is that of Terrell, the vendor of the land. He says, that Anthony was neither directly nor indirectly, a party to the contract: that at the time of the purchase, and afterwards, Leftioich told him, he intended to give Anthony one half, and would give him the other, after he paid for it. This witness is asked by the plaintiff the following question, “Did you not hear Leftioich say, that the crops were to be applied, in payment for the land; and that when one half the purchase money was raised by the labour of the hands, the land would be conveyed to Anthony?" (Surely this leading question gives a pretty strong impression of the plaintiff’s opinion, as to a very striking feature in the contract, to wit, whether the land and slaves were to be held for 5 years only, or until the 900k were raised.) The witness answers, “ Leftioich said, when they made the money, and paid for the land, he intended to give it to Anthony.”
From this review of the evidence, it appears that the contract is wholly uncertain. The bill states it one way; the answers deny it altogether. Six witnesses state it differently from the bill, and most of them differ from each other; furnishing the strongest illustration of the wisdom, of the statute, and the danger of trusting to evidence of this kind.
If it be said, that the contract is sufficiently explained by the conduct of Leftioich, and that his giving up the slaves and land, is proof that he had received all, that he was to raise from them, under the contract; I answer, that to my mind, these acts neither shew, that they were in *251 execution of the contract, nor do they prove what the contract was. As to the land, possession of that was never delivered under the contract, nor in part execution of it. Anthony was in possession as (.he tenant of Terrell. Leftwich bought, and Anthony still continued to live on the land. This continued possession, in a case between father-in-law, and son-in-law, proves nothing. Anthony still held the upper part of the tract, where he lived; and Left w'eh held the lower part. Nor is there any evidence, that Liflwich was ever out of possession, till his death. Some of the witnesses say, that he told them, he had rented of Anthony; hut this evidence is too loose and doubtful, to justify any conclusion. The fact too, of Leftwich’s relinquishing the management of the hands and disposition of the crops, is susceptible of the explanation given by the answer. He might have despaired of raising the money, from the frequency of Anthony’s drafts on him, and determined not to trouble himself further with the management, as he considered himself safe while he retained the legal title to the whole tract. It certainly is not one of those acts required by the cases, clear, unequivocal, referring itself directly and necessarily, to the identical agreement stated in the bill, and explaining that agreement; an act, in short, which could only have been done in part performance, of that very contract. If then we take upon us a specific execution in this case, which agreement should we adopt? Not that stated in the bill, certainly; for it must be agreed on all hands, that as stated, it is entirely without support. Which of the witnesses shall we follow ? for they all differ. Indeed, as the answer acknowledges no agreement, can we decree on one different from that stated in the bill? Would it not be decreeing on a contract not in issue; which the defendant had never been called on to confess or deny; and had had no opportunity to disprove? To decree a specific execution in such a case, would, as it seems to me, be entirely a leap in the dark, and a violation of tbe best settled rules of practice»
*252 2. As to the time suffered to elapse before filing the bilL. Although time, in many cases, is not considered in equity as of the essence of the contract, unless declared so by the terms of the contract; yet in every application for a specific execution, it is a circumstance of weight, and will be viewed in all its probable effects and consequences. It is laid down generally, that he who comes for a specific execution, must not sleep upon his case, but come recently. Time is pretty certain to operate a change in the circumstances of the parties, and the situation of the subject matter of the contract It destroys the evidence; it cuts off the parties to the transaction; and their successors know not how to explain, what they might have made perfectly clear; or where to look for the evidence, actually existing, which might shed light upon the subject. In the case before us, Leftwich, if living, might be able to shew (as several of the witnesses say he stated to them) that he abandoned the management of the slaves, and disposition of the crops; not because he had raised the 9001. but because he despaired of raising it. He might also have established those accounts which he left on his books, and which bring ¡Anthony considerably in debt, after crediting him by the crops. ¡Anthony had a right, according to his bill, to demand a deed in 1808. Leftwich lived seven years after, and yet he never stirred in the business, till after his death. Time is also of importance, in another respect; it is evidence of abandonment, and the other party, upon that presumption, may predicate arrangements, which would render a specific execution, unjust, nay, ruinous. If ¡Anthony, during the life of Leftwich, had vindicated his claim, we cannot doubt, that it would have had a most material influence on the old man’s will; but though Leftivich told his son, that ¡Anthony teazed him on the subject, this seems to have been rather in the style of a petitioner. We hear of no demand of a right, secured to him by a contract, which he had executed; and no one can. read the will of Leftwich, without a perfect conviction, *253 iliac it was made under the full belief, that he was the rightful owner of the land. In Harrington v. Wheeler, 4 Ves. 686, a vendee of land, suffering six years to elapse, before filing his bill for a specific performance, was considered guilty of such gross negligence, that his bill was dismissed with costs; the Lord Chancellor saying, that there was no case to support it, except Gibson v. Patterson, 1 Atk. 12, which was wholly a false report.
3. The third point is, the harsh operation of a specific execution. This ought certainly to be a weighty consideration, when the question addressed to our sound discretion is, whether, upon the whole case, it is better to leave the party to law, or give him the aid of equity. In Harnett v. Yielding, 2 Sch. & Lefr. 549, Lord Redesdale says, “ I have bestowed a good deal of consideration upon this case, and particularly in reference to the jurisdiction exercised by Courts of Equity, in decreeing specific performance of agreements. Whether Courts of Equity, in their determinations on this subject, have always considered, what was the foundation of decress of this nature, I very much doubt. I believe that, from something of habit, decrees of this kind have sometimes been carried to an extent, which has tended to injustice. Unquestionably, the original foundation of these decrees was simply this; that damages at law would not give the party the compensation to which he was entitled; that is, would not put him in a situation so beneficial to him, as if the agreement were specifically performed. On this ground, the Court has, in a variety of instances, refused to interfere, where, from the nature of the case, damages must necessarily be commensurate to the injury sustained.” He proceeds to state, that equity, in the exercise of this jurisdiction, will not compel a party to do what shall lay the foundation of an action against him, or possibly injure a third person, by creating a title with which he may have to contend; because, (he adds,) “ this would produce a consequence, which quite passes by the object of the Court; *254 which is to do more complete justice.” In Emery v. Ware, 5 Ves. 846, (on appeal, before the Master of the Rolls,) the doctrine came into question, whether a huswho had contracted that his wife should convey her interest in an estate, should be compelled to a specific performance. The bill was dismissed by the Master of the Rolls, and decree affirmed by the Chancellor, on appeal. In Mortlock v. Buller, 10 Ves. 305, Lord Eldon, speaking of this case of Emery v. Ware, says, upon the appeal, “ I adopted Lord Alvanley’s opinion, that it is not incumbent on this Court, to decree a specific performance, where such a circumstance as a careless valuation, was likely to lead to harsh consequences, on that irregular doctrine of this Court, that a husband must go to jail, if he cannot procure his' wife to join in the act, for which he has contracted.” In Fain v. Brown, before Lord Hardwicke, (cited in 2 Ves. 304,) a person owned a small estate, which had been left him by will, with a condition annexed, that if he sold it in 25 years, half the purchase money should go to his brother; he entered into an agreement, in writing, to sell it, and afterwards refused to execute the agreement, pretending to have been intoxicated when he made it. A bill was filed for specific execution; and Lord Hardwicke said, that without the other circumstances, the hardship alone of losing half the purchase money, if carried into execution, was sufficient to determine the discretion of the Court, not to interfere, but leave them to law. Here is a fair contract, made with a full knowledge of its consequences, and yet the Court refuse its aid, because it would operate harshly. Does not the case, before us, present still stronger objections to the interference of equity ? Anthony lay by, for seven years, and suffered Leftwich to consider, and to deal with, the land, as his own. He devised the one half of it to his daughter Catherine. This is her sole interest in his estate, unless there may be a residuary fund. It is the sole provision her father has made for her. Take this land from her, and give it to Anthony, you throw her portion- *255 less and pennyless upon the world; and that in favor of one, by whose laches alone, this calamity could ever have fallen upon her. Refuse a specific execution, and you only send Anthony before a jury, to recover what he can shew himself entitled to; and that recovery, instead of falling wholly upon one of the children, will be divided among them all. To interfere in such a case, would, it seems to me, be to pervert the principles of equity, and to defeat the justice of the case, by the exercise of a discretionary power, given for the sole purpose of rendering more complete justice.
4. My fourth objection to a specific performance is, that the acts of part performance all lie in compensation. In Clinan v. Cook, 1 Sch. & Lefr. 22, Lord Redesdale says, "I take it, that nothing is considered a part performance, which does not put the party into a situation, that is a fraud upon him, unless the agreement is performed. For instance, if upon a parol agreement, a man is admitted into possession, ho is made a trespasser, and liable to answer as a trespasser, if there be no agreement. That, I apprehend, is the ground, on which Courts of Equity have proceeded, in permitting part performance of an agreement, to he a ground for avoiding the statute; and I take it, therefore, that nothing is to bo considered as a part performance, which is not of that nature. Payment of money” (he adds) “is not part performance, for it may be re-paid; and then the parties will be just where they were before.” In Forster v. Hale, 3 Ves. 713, there is a very strong and clear opinion of Lord Alvanley, that in all these cases, there should he compensation, rather than specific execution. In Parkhurst v. Van Cortland, 1 Johns. Ch. Rep. 273 Chancellor Kent says, "The tendency of the modern cases, is to prefer giving the party compensation, in damages, instead of a specific performance. Wherever damages will answer the purpose of indemnity, this alternative is to be preferred, as it will equally satisfy justice, and will ho in eo-mcidenec with the provisions, and in *256 support of the authority of the statute.” In this opinion, I heartily concur. It is safe and sound doctrine. In our case, (as I have said before,) the great point, the delivery possession under the contract, does not occur. Anthony was in possession before the purchase, and merely continued to hold. It is laid down in several cases, that the mere holding over of a tenant, is not evidence of possession under any final contract he may set up, and does not take the agreement out of the statute; nor can you make Anthony a trespasser, whether there was an agreement or not. He continued his possession, under the express permission of his father-in-law; and no jury on earth would give damages against him as a trespasser. As to the houses he built, and the ditches he dug; these lie directly in compensation; give him what they cost, and you place him where he was. Nor can he have any difficulty in the proof, if we may judge from the depositions he has taken on that subject.
Although, for these reasons, I am utterly opposed to a specific performance, I have no doubt that there was some arrangement between Anthony and Leftwich, under which Leftwich received the crops, and Anthony made the improvements on the land; and it is but justice, that Anthony should be compensated for these crops and improvements, if, upon a full and fair settlement of all claims, between him and the executor of Leftwich, there should be found any thing due to him. My own opinion was, that we ought to dismiss his bill, and let him litigate this matter at law; but as it is doubted by some of the Court, whether he could maintain an action at law, for the monies expended in improvements on the land, I am willing (as I consider such a measure within the power of a Court of Equity,) to send the case back to the Court of Chancery, with such directions as may be necessary, to bring the executor, in that character, before the Court, and then to make up an issue, or refer it' to a commissioner, to ascertain the amount of Anthony’s claim; the executor of Leftwich being at liber *257 ly, on tho trial of such issue or reference, to make all the toffsetts he may be able to establish.
This is as far as I can go. To the decree agreed on, by rs. majority of the Court, I cannot assent.
Judge Greek:
After a most careful examination of this record, I am led to the conclusion, that upon the purchase of the tract of land in question, from Terrell, it was agreed between Anthony and Leftwich, that Leftwich should give to Mrs. Anthony, as an advancement, that part of the land which lay above the Cowhide branch;—-a moiety, or nearly so, of the whole tract; and that he should have Anthony’s crop then on hand, and six of Anthony’s hands, and seven of his horses, with which to work that part of the land below the Cowhide branch, and take the crops for the purpose of raising 900/. the moiety of the purchase money; and that when that was effected, he was to convey that part of the land to Anthony: that in pursuance of this agreement, Anthony continued in the possession of the land above the Cowhide branch, until the death of Leftwich, and the latter received Anthony’s crop, on hand at the time of the agreement, and worked Anthony’s hands and horses on the lower end of the land, for five years, and received the crops; and thereafter continued in possession of the lower end of the land, and worked it with his own hands, as long as he lived: that Anthony, upon the faith of this agreement, made, during those five years, valuable and permanent improvements, in building and ditching, on the land below the Cowhide branch; and during Leftwich’s life, made similar improvements, of considerable value, upon the land above the Cowhide branch.
The will of Leftwich disposes of the whole of the land, contrary to this agreement; and Anthony seeks relief by this suit
*258 Various reasons are assigned, why a Court of Equity sfiould not give any assistance or relief to the plaintiff, in this case.
The first objection is, that it would be contrary to the terms and policy of the statute of frauds and perjuries.
The uniform series of decisions in England, from the passing of the statute to the present time, and in this Court, establishing the jurisdiction of a Court of Equity, to give relief in such cases, might be a sufficient answer to this objection. Some of the English Chancellors, and others, have indeed complained that the cases have gone too far, as to the mode of relief; and have regretted that the statute (as they express it) has been at all broken in upon. In the exercise of this jurisdiction, cases of great delicacy and difficulty must sometimes occur; and the occurrence of such cases has probably given occasion to those complaints. Yet if a case had, for the first time, been presented to any one of the Judges who have thrown out objections to this jurisdiction, in which one party, on the faith of a parol agreement, had expended large sums of money, in permanent and valuable improvements, and the other, availing himself of the legal advantage given him by the statute, appropriated such improvements to himself, leaving the purchaser without any means of indemnifying himself at law; I cannot help thinking that he would have felt himself bound, upon universal and well settled principles of equity, to give the suffering party relief, either by enforcing the specific performance of the agreement, or by decreeing an adequate compensation, according to the circumstances of the case.
It is a general rule of equity without any exception, so far as I am informed, that no one shall avail himself of a law made for his protection, so as to injure another; and especially not to enrich himself, at his expense. An unregistered deed in England, is void by statute, against a subsequent purchaser, even with notice of the deed. 1 Madd. Chancery, 260. Yet a purchaser, with notice of *259 the unregistered deed, will be postponed in equily. Lands ean only pass by will executed with solemnities prescribed by statute; yet if an heir fraudulently prevents his aneestor from making a devise which he contemplates, a Court of Equity will hold him a trustee for the intended devisee. Ibid. 210. If the owner of land, even by a fraudulent silence, encourages another to purchase the land from one having no title, equity will compel him to make the title good. Instances, almost without number, of the application of this rule, might be cited. Equity holds, in such cases, that the party is guilty of a fraud, in availing himself of a legal right, to the prejudice of another; and will uot permit him to profit by his fraud, at the expense of that other. The statute of frauds was intended to protect parties against feigned or incomplete agreements. But when one party induces another, on the faith of a parol contract, to place himself in a worse situation than he would have been, if no agreement had existed; and especially, if the former derives a benefit therefrom, at the expense of the latter, and avails himself of his legal advantage; he is guilty of a fraud, and uses the statute for a purpose not intended; the injury of another for his own profit. The fraud does not consist in availing himself of the statute to protect himself; but in using it to appropriate to himself, what justly belongs to another.
In the case at bar, Jlnthony could not, by any proceeding at law, recover any compensation for the improvements made by him, on the land. lie could not, in an action at law, give any evidence of a parol contract; and without such evidence, he would appear to have made improvements on Leftivich’s land, of his own accord, and without the special instance and request of Leftwich. Even in a case, in which the plaintiff declared that a contract had been made, and money paid in pursuance of the contract, and that the contract had been abandoned by consent of the parties, and that the defendant assumed to re-pay the money, with interest; he was not permitted to prove apa *260 rol contract, although the action was not upon the contract, Up0n the subsequent assumpsit. 1 Bos. & Pull. 306. It appears from this case, that the money paid, but without interest, might be recovered back, upon account for money had and received. But of this, I doubt. If a party sues for money had and received, I should hardly think, that proof of the payment of the money was alone sufficient, to justify the conclusion, that it was received for the use of the plaintiff. Dig. 13, 22, tit. 3, § 25. It should probably be presumed, that it was paid in satisfaction of some just demand, until the contrary appeared; as, that the consideration, upon which it was paid, had failed; and that consideration, being a parol contract for the sale of land, no evidence could be given in relation to it. If, in such case, it was determined, that money paid in pursuance of the agreement, or laid out in improvements, could be recovered back, upon general money counts, without going into evidence of the contract, then in many cases, great injustice might be done to the defendant. He might always have been ready and willing to execute the contract; yet could give no evidence to that effect. Buildings put up by the purchaser, might be destroyed by fire, and the vendor be liable in an action at law, for their value, although, in the event, he could have no benefit from them. It seems to me, that there is no remedy at law in such cases; and if there were, that in most eases of part performance, no remedy at law could do justice to both the parties, unless an enquiry could be made into the particulars of the contract; and this appears to be inadmissible. It seems that Justice Buller, at one time thought, that a remedy might be had at law, upon a parol agreement in part performed. Brodie v. St. Paul, 1 Ves. jr. 333. But he afterwards renounced that opinion as untenable. Cooth v. Jackson, 6 Ves. jr. 39.
In such cases, a Court of Equity may give relief upon the ground of fraud, and because there is no remedy, or a very inadequate one, at law. O’Herliky v. Hedges, 1 Sch. *261 & Lefr. 123. To determine on the proper measure of relief, it is necessary to ascertain the terms of the contract; and they being ascertained, afford a just foundation for relief, by a specific execution or compensation, as the one or the other may, upon all the circumstances of the case, be found to be most equitable. I can see no reason, founded upon the statute, which opposes the one more than the other species of relief. A written contract does not bind the party at law, to part with his title; but only, to answer in damages for his refusal to execute it. Yet a Court of Equity, in a proper ease, will decree a specific execution. The exercise of this jurisdiction is not compulsory; but depends on a sound, and not an arbitrary discretion, governed by settled principles. If a written contract should, upon these principles, be found to be such as ought not to bo executed, a Court of Equity will not give any other relief, in general; because the party has an adequate remedy at law. But if a parol contract, in part performed, ought not to be specifically executed, the Court should, in such case, decree a just compensation; because there is no remedy for the party at law; and relief against the fraud can be given in no other way.
The next objection is, that the contract is uncertain, and therefore, cannot be executed. Uncertainty in the contract is a frequent objection to the specific execution of a contract, even when in writing. But it applies only to cases, in which the terms of the agreement being ascertained, either by writing or otherwise, it is uncertain, upon the ascertained terms of the agreement, what the parties stipulated for; as upon articles to make a settlement, without specifying the amount or property to be settled, or to give a fortune to a daughter, on her marriage. In such and like cases, the contract is too imperfect or uncertain, to enable the Court to carry it into effect specifically. But the objection does not apply in the case of a parol contract, the particulars of which it may be difficult to collect from the evidence. The uncertainty, in such ease, is not as to the *262 meaning of an ascertained agreement, depending upon the construction of its terms; but, as to the matter of fact, whether the terms were to this or that effect; a difficulty to be slvecb as are all other questions of fact, by a careful comparison of all the evidence; and if that be so contradictory, that the Court cannot make up a satisfactory opinion as to the fact, it should be referred to a commissioner to examine and take any other evidence which may be produced, or to a jury, to determine upon the fact, upon weighing the whole evidence, and deciding upon its credit. Attorney General v. Day, 1 Ves. 221; Boardman v. Mostyn, 6 Ves. 467; 1 Madd. Chancery, 300. In the case of parol contracts for land, partly executed, it is the duty of the Court to exert all its means, to ascertain the terms of the contract, whenever it appears conclusively, that a contract did exist, upon the faith of which, one of the parties has expended his money, and this, in order to prevent a total failure of justice.
If I am right in the conclusions drawn from the evidence in this case, there is no uncertainty as to the effect of the terms of the agreement. The only uncertainty is, as to the effect of the evidence tending to prove the terms of the agreement. It is true that a party, who claims a specific execution of a parol contract, ought to make out the contract and all its terms, satisfactorily and clearly. The evidence upon which he relies, if it leave any doubt as to what were the terms of the agreement, should be taken most strongly against him, and the matter in doubt determined against him. I have proceeded upon this principle in considering the evidence, in this case. The terms stated above, are the least beneficial to Anthony, that can, upon the evidence in this cause, be supposed to have existed .
Another objection is taken; that the delay on the part .of Anthony to assert his rights, under this contract, preeludes him from now seeking any relief. Such laches is frequently a fatal objection to relief in equity, by a sped- *263 fie execution. If nothing be done under the contract, such delay may afford a presumption, that the contract is abandoned; or if material changes have, in the mean time, been made in the property, or its value, the delay affords proof, that the party has not acted bona fide; and that if the property had not increased in value, he would never have asserted any claim to it. In the case at bar, the conduct of Anthony afforded no ground to presume that he had abandoned the contract. He solicited Leftwich, almost until the moment of his death, with a painful importunity, to execute the contract; and, in this respect, went perhaps as far as could reasonably be expected, considering his relation to L,eftwich. The delay in asserting his remedy by suit has, in another point of view, an effect upon this case, which will be hereafter adverted to; but ought not, I think, to preclude him from relief altogether.
A fourth objection is, that the contract allcdgcd in the bill is not proved; and that, therefore, no relief can be given in this case. It is true, that the contract proved, materially varies from that stated in the bill. At law, an action cannot be maintained, unless the case is proved as stated in the declaration, for two reasons; 1st, to prevent a surprise on the other party; 2dly, to prevent a new suit for the same cause. For as the proofs never appear upon the record, the plaintiff, after recovering upon a contract different from that laid in the declaration, might maintain another action for the same cause, which could not be shewn to have been satisfied in the former action, by the exhibition of the record. Yet even at law, considerable differences between the allegata and probata are tolerated, as to sums, dates, Uc, In equity the same rule prevails, with less rigor; since the case upon which relief is given, always appears on the record, and there is no danger of surprise. It will not even there be allowed to recover upon a case proved, essentially differing from that alledged in the bill, as the proofs must he confined to the issue. Thus, in a case in Fssey’s Reports, the hill stated *264 the terms of the contract in one way, the answers in ano» ther, and a witness in a third way; and the decree was according to the answers; a proof that to justify relief, strict nroof of the terms of the contract, as charged in the bill, r ,, „. .. ° is not indispensably necessary. Mortimer v. Orchard, 2 Ves. jr. 243.
If, however, the contract was so uncertain, as that it could not, for that cause, be specifically executed; or if the variance between the contract proved, and that insisted on in the bill, presented an insurmountable obstacle to relief in that form; these circumstances would not preclude the Court from giving relief, by compensating the plaintiff for the actual loss which he has sustained, in consequence of acts done, upon the faith of some agreement, and from which the other party has derived an equivalent benefit; especially as the defendants do not admit, nor offer, nor are able to perform, any agreement. In Philips v. Thompson, 1 Johns. Ch. Rep. 131, the plaintiff failed in proving the agreement set out in his bill; and in Parkhurst v. Van Cortland, 1 Johns. Ch. Rep. 273, the agreement was too imperfect for a specific execution. Yet in the first case, an issue quantum, damnificatus wás directed; and in the other, it was. referred to a master to ascertain the value of the permanent improvements, made by the plaintiff, on the faith of the contract.
The last objection is, that a specific execution, in this case, would be a great hardship upon the devisees, claiming under Leftwich’s will; since it would deprive them of the provision intended for them, without the possibility of their being, in any way, indemnified. I think this objection is well founded; especially as the failure on the part of Anthony, to assert his rights under the contract, by suit, in the life-time of Leftwich, although it did not amount to an abandonment of the contract under the circumstances which existed, and did not, in equity, deprive him of a right to compensation fo.r the actual losses which he sustained, by the part performance of the contract; yet *265 ip lulled Lcftwich into security, so far at least, as to induce him to believe, that he had it in his power to make an effectual disposition of the property by his will. If he had doubted as to this, or if a suit had been brought in his lifetime, to enforce the contract, he would have made some alternative provision for his daughter Catherine; for he seems to have been anxiously scrupulous to distribute his estate equally amongst his children. Such a hardship is sufficient to induce a Court of Equity, exercising a sound discretion, to refuse a specific execution of even a written agreement; as, if the consequence of a specific performance would be a loss to tile vendor of half the estate, or to subject him to the consequences of a breach of trust.
The proper relief, in this case, therefore, is a just compensation, and not a specific performance of the agreement.
As to the mesure of that compensation, it ought to be preciscly;.jvhat Jlnthony was out of pocket, in consequence of the acts done by him, upon the faith of the contract; and from which Leftwich, and those claiming under him, have received a corresponding benefit. No allowance can he made him, for any disappointment in the non-execution of the agreement. That would be to decree him damages; and no damages can be decreed in equity. There is, indeed, one case, in which damages were decreed in equity. Denton v. Stewart, 1 Fonb. 38, (n.) That was a case of a parol contract, which the vendor disabled himself to perform, by a conveyance to a purchaser, without notice. No damages could be recovered at law, and no injury had been sustained by the purchaser, except the loss of the contract. He had paid no money, and laid out nothing in improvements. If he had, there would have been a perfect propriety in indemnifying him to that extent. This case was afterwards disapproved of, and reluctantly followed by the Master of the Rolls, in two cases; and was declared by the Chancellor, Lord Eldon, to be contrary to the practice and principles of a Court of Equity, and in effect, overruled „ *266 Greenaway v. Adams, 12 Ves. 395; Gwillim v. Stone, 14 Ves. 128; Todd v. Gee, 17 Ves. 273.
Anthony can, therefore, claim nothing for the rent of the lower end of the land; for that would, in effect, be an allowance to him of damages, for the non-performance of the contract. He has wholly failed in the proof of the agreement on the part of Leftwich, to pay rent, as alledged in the bill. He never demanded any rent, and the arrangement, in respect to Dobyns, whatever it was, does not tend to prove this allegation. That took place in “the fall of 1807, whilst the contract was in a course of execution, and the land considered by both parties, as belonging virtually to Anthony; as appears by the working of it with his force, and the improvements made thereon. This continued to be the state of things, until the close of the year 1808. Leftwich did not think it proper, in this state of things, to put Dobyns on the land, without the assent of Anthony; and this accounts for the arrangement with Anthony, on that subject. At the end of the year 1808, the land was no longer considered as Anthony’s. Leftwich cultivated it, as his own, with his own hands, and for his own benefit; and we hear no more of any stipulation or demand, for rent. Nor ought Leftwich to have any allowance for rent of the lower end. of the land, for the five years it was cultivated by Anthony’s force. The use of the land, during that time, was given to Anthony, as an additional advancement to his wife; as was the use of the upper end of the land.
Anthony should have just allowances for the value of the improvements, put by him upon the land below the Cowhide branch; and also, for those put upon the upper end of the land. If the upper end of the land had been conveyed to his wife, according to the agreement, he would have received a personal benefit from the improvements. He would have been entitled during the coverture, and if he survived his wife, for his life, as tenant by the curtesy; and his wife might have joined him in a sale of the land. *267 These considerations must be presumed to have induced him to make those improvements. The provisions of the will deprive him of those rights. He should also be allowed the sums received by Leftwich from the proceeds of his crop on hand, at the time of the contract, and of the five crops made upon the land by his force, under the direction of Leftwich; and should be debited with all expenses incurred by Leftwich, in making the crops and getting them to market; and with ail sums of money due from him to Leftwich, on any other account.
The personal representative of Leftwich, is not a party. If it was ascertained, that the personal assets of Leftwich wore sufficient to make the compensation which may be found due to Anthony, the devisees of the land would not be necessary parties. But, as that is not ascertained, and it may turn out to be otherwise; in that event, the contract should be specifically executed, unless the devisees should elect to make good any deficiency in the compensation due to Anthony, which the personal assets may not be sufficient to pay. They ought to be retained in Court; and the plaintiff to have leave to amend his bill, and make the personal representative of Leftwich, a party defendant.
The decree should, therefore, be reversed, and the cause remanded for further proceedings, and relief given according to the foregoing views; unless the personal representative of Leftwich should vary the case, by any thing allodged in the defence to be made by him.
Judge Coarter:
On a careful examination of the evidence in this case, and taking into view, as well the declarations as the concurring acts of the parties; considering too the relation in which they stood to each other; that no breach had taken place between them; and that Anthony had no reason, even down to the death of the testator, to believe, that justice, though delayed, would bo denied him; (for I think *268 there is strong reason to believe, that shortly before liis death, Leftwich desired him to have a deed prepared for .execution) I am of opinion, that the contract stated in the bill, is substantially, if not literally proved.
Leftwich felt the propriety, as well as the desire, to advance his daughter, the wife of the appellant, in marriage, as he had and intended to do by others, and took this method of doing so. He had confidence in Anthony, except on the score of age and inexperience, and it was his wish to settle them on this land, which was near him, and over which, for their benefit, he could exercise a superintending control, until it was paid for, and they comfortably settled. But for this understanding between the parties, no one will pretend to say that Leftzoich would have purchased the land. Anthony lived on it as a tenant at the time the purchase was made. Before that took place, the arrangement and understanding between them, as stated in the bill, had been agreed on. The treaty for the land, therefore, was opened by Anthony with Terrell. They talked of the price, and then proceeded to the house of Leftwich, who became the purchaser, and gave his bonds, with Anthony as security; and, either at that time,,or soon after, (as is proved by Terrell,) Leftwich told him that one half of the land was intended- for Anthony, and the other half also, when he paid for it: that for this purpose,"he was to have the use- of Anthony's hands, Sac. to cultivate it; and afterwards admitted, that he had had the use'of them accordingly. I shall not, however, go into a detailed view of the evidence. Suffice it to say, that I am satisfied the purchase was made, and Anthony induced to join'in-it, and devote his means, according to the contract, in paying for it, and his labour and other means in putting very considerable improvements on it, by the assurances of Leftwich that 9001. or thereabouts, was-to,be paid by him, by way of advancement to his daughter,'’though hp was to raise the other half by the labour of Anthony's hands on the land; and that when the land was thus paid for, it should *269 be Anthony’s. It may be said, that Leftwich did not intend to convey the whole to Anthony, but to give an undivided moiety to his daughter; and that this was sufficient to make it the interest of Anthony to improve the whole tract; and that for doing so, he had thus a sufficient inducement.
If there had been a tender of such conveyances as these, I should have been satisfied; though I think the weight of the evidence is, that Anthony was to have the land, and that the advancement by Leftwich to his daughter, was to be of half the purchase money. This arrangement, however, would have enabled Anthony and wife, to join in a sale, if necessary for family purposes; and at all events, would have ensured Mm a home for life, with the enjoyment of the whole property; and would also have produced ultimate results, in certain events, as to this moiety, very different from those which may take place, under the limitations in the will.
Under this view of the case, I should consider it the province of this Court to execute the contract, were it not that by the will of Leftwich, he has devised the lower part or moiety of the land, to his daughter Catherine, and the serious consequences to her, should an execution of the contract be decreed. On this ground, I incline to think, the authorities will justify the Court, in that sound discretion which is appealed to in such cases, to refuse the decree for specific execution; provided a fair and adequate compensation can be made to the appellant, for the disappointment so unjustly thrown upon him. If this cannot be done, 1 think, as he is equally innocent with the appellee Catherine, and has not only prior, but greater, equity, (being a purchaser for value, and she a mere volunteer,) he is entitled to the property. He ought to have a fair and adequate compensation; and this Court, therefore, ought to lay down such rules and principles, in regard to that, mailer, as will ensure it
*270 To this end, it may be proper to enquire, what would be our measure of compensation, in case Leftwich himself was a defendant, having made the contract above stated, but, in fraud of Jlnthony, had put it out of his power to comply, and forced upon this Court, the necessity of making compensation, instead of more ample justice, giving the thing itself ?
As between these parties, and that there might be no risque of injustice, arising from the lapse of time, and the difficulty, if not impossibility, at this day, to ascertain the value of the crop on hand belonging to Jlnthony, and of the successive crops for live years cultivation by the labour of his hands; I would at once assume that these means of Jlnthony had produced the 900/. which, at the time of the contract, it was expected they would produce.
I would do this, not only for the reasons aforesaid, but because Leftwich has never complained that such was not the fact. All his witnesses prove his occupation of the lands, slaves, horses, &c. for five years, when the latter were restored to Jlnthony; but that part of the land, so cultivated, continued in the occupation of Leftwich, clearly, as I understand the testimony, as a tenant, though the title was in him. No complaint is heard, that the money had not been raised within the five years; but the complaint was, that he had to make other advances for Jlnthony, which absorbed those funds, originally destined to the payment of the purchase money.
What those advances were, and how that account stands, we do not know, as no account has been taken. An account was thrown in with the answer, which shews, among other things, that Leftwich and Jlnthony had bank transactions, in which Leftwich became responsible; whether Jlnthony or the executor has since taken in the note, does not appear. But it does appear, that in 1814 and 1815, Anthony made considerable advances in land and money, to Leftwich, on that account; whether sufficient or not, we cannot tell. But Leftwich had then occupied the land, *271 rendered valuable by the ditching done and barns built by Anthony; so that, it was capable of producing, and did produce, first rate low-ground tobacco. Allowing Anthony what was reasonable for this, which the witnesses say was from $ 150 to $ 200 per annum, (and surely, if the contract had been executed, and the deed made, Anthony would have been entitled to this, against the advances made for him,) Lefttoich was probably satisfied, or nearly satisfied, for those advances. How else was it, that he told the witnesses, (one of whom details a conversation as late as 1815,) that the lands were Anthony’s, and that he was willing to convey them; but as he (Anthony) had talked of selling, and removing to Lynchburg, he was afraid he would do so; and as the title was in him, he would not com vey during his life ? But this was not his declaration to Anthony, who was constantly pressing for a deed; on the contrary, in 1816, on his death-bed, he desired him to get his son to prepare a deed. This, I think, is proved by the bill and the response thereto, in the answer. Not a witness on either side, proves a declaration or hint, by Leftwich, that the profits of the laud for the five years, with the crop on hand, did not produce the 900/. On the other hand, several witnesses, speaking of the value of the lands and labour supplied by Anthony, estimate them at from $700 to $ 1000, per annum. Besides the land, there ,were six hands, and four or five horses. Set them down at $ 600 per annum, (which would be very little more than the hire of six hands and the horses, especially as Anthony clothed the hands, and probably paid the black smith’s and other expenses of the farm,) this, for five years, in addition to the crop on hand the first year, will more than pay the 900/.
If Lefttoich thought proper to aid his son-in-law, just setting out in life, with other advances, holding him chargeable therefor, and, if you please, holding even a lien-on the land for his re-imbursemeut, it was no more than might be expected, and what he had a right to do. But *272 tb>s could not alter the contract for the land, or vary the j-jgpts of the. parties under that contract.
From the complexion of the answer, and some declara^ons by Leftioich, I supposed some excuse for his not making the title, would be found in the imprudent conduct of Anthony; but a host of witnesses prove the reverse» No one even proves that he offered to sell and go to Lynch-burg, which might have been imprudent. This seems to be the great objection with Leftwich, to his making a conveyance according to the contract.
For all these reasons, and upon the case as it now stands, if the suit was between Anthony and Leftwich, I think he ought to be charged with the purchase money of 900/» as being paid by Anthony.
I think also, if there were parties before us, that Leftwich ought to be charged with the rent of the land, during the time he occupied it, after the expiration of the five years. He enjoyed, not only the land itself, but its increased profits and value, arising from the improvements of Anthony; so that, as far as this latter goes, he actually enjoyed Anthony’s money. Shall he hold this without account?
It may be said that this would be giving damages; and that as we cannot give the lands, we cannot give the profits. I do not think so. To test this principle, let us state the case thus. Leftwich agi’ees to inake the purchase with Anthony, to become bound for the purchase, money with him, to advance one half for his daughter, to take the title to himself as security, that Anthony will pay his half, and to hold half the land and be accountable for a reasonable rent; and finally to convey to him, if he pays his half. Anthony pays his half. In the mean time, Leftwich makes other advances to Anthony; continues to hold the land after the payment by Anthony; and receives payments from him, on account of those advances; and while the transaction stands thus; these accounts unsettled, and Leftwich, for some other cause, (or because he finds *273 that if ho conveys to Anthony, he will have to account for those rents) determines to avoid this, and for this purpose, sells to an innocent purchaser without notice, and puts it out of the power of the Court to compel a conveyanee, and as a consequence, as he supposes, to avoid the payment of these rents. Are we to be told, that in taking an account of the purchase money paid by Anthony, (to say nothing of the monies actually expended by him in rendering arable the very lands he has thus occupied and sold,) that he shall be admitted to set-off his account for other advances, which may be discharged by those very rents, and would so have stood discharged, had he not resorted to these means of defrauding him of this fair set-off against those advances? This would seem to me, a strange measure of justice. 1 think it would not only be injustice, hut a handsome premium, amounting to from #1200 to $ 1600, awarded by this Court, for the fraud thus practised by him on Anthony. Suppose this contract last supposed, had been evidenced by a memorandum in writing, so that this Court could safely send Anthony to a Court of Law, and the jury there should make a special statement, charging Leftwich with the 900/. paid by Anthony, and interest thereon, with the monies or labour expended by him, in improving the land, and with these rents, and give Leftwich credit for the monies and interest advanced by him to Anthony, and find their verdict in damages for the balance. The purchase money and interest would thus come in lieu of the land, of which he had been unjustly deprived. Ho has lost his improvements also, and gets the value of them. He has been unjustly deprived of his rents, which, hut for this injustice, could have set-off the account for advances; and thus, as far as the nature of the case would admit, the jury would have done him justice, and no more than bare justice.
But would this be damages? No more than such damages as a jury would assess in a suit for money had and received, for monies and labour laid out and performed, and *274 for the use and occupation of lands; all of which are also matters of account in equity. And would any Court set aside such verdict as illegal and unjust? I think not. We are thrown into some confusion, I appi’ehend, on this subject, from the various opinions entertained about the effect of the evidence in this case, in relation to the contract; and therefore, I have thought it proper to test this principle, by supposing a plain case.
But suppose the jury, in the case above put, had gone further (and I am not prepared to say that they might not do so) and had considered, that as Jlnthony, at an early age, had been thus induced to occupy this land, to improve the whole of it, extensively for his means, and to advance his money in the purchase, believing he was thus permanently settling himself and family; and under this delusion, to spend some twelve or fifteen years of the prime of his life; at the end of this time, he finds himself limited to the occupation of one half of the land, (the whole being probably not more than enough for his force and energies) and that to that half, placed in a situation to be turned out of possession, or become a tenant to his children on the death of his'wife, and indeed, the whole industry of his life, in certain events, to pass over to the Leftiuich family: that in consequence of this fraud upon him, he is reduced to the necessity to submit to this cruel hardship, or look out elsewhere for a permanent abode, and thus, even lose, in a great degree, the benefit of an advancement to his wife, •which he was induced to calculate on; I say, suppose the jury, considering these things, should add further damages to their verdict, for this injury. This, I admit, would be a matter sounding, as the law says, purely in damages, and which, I am not prepared to say, a Court of Equity could give, even upon an issue of quantum damnificatus. I shall not insist that we can; though certainly he has been thus damnified, according to my view of the case.
But I think we may very fairly say, that this injury, haying really accrued by the conduct of the party, a Court *275 of” Equity will at least direct the accounts to be taken in a way, which will cover all injuries which may be estimated by a commissioner.
I think I have slated nothing that is not every day’s practice, for a commissioner to take an account of; and the only question is, whether there is any just principle, which will exclude an account of the rents in this case, because we cannot give the land also ?
I see nothing opposed to if, but the injustice of the party, whose representatives seek to shelter themselves under that injustice. In tenderness to the appellee, Catherine, we withhold the land, which, but for that, would come in place of the purchase money and improvements, leaving the rents to be set-off against other advances. Shall these advances now remain without this just set-off, because we cannot give the land? I think not; otherwise, we do not give a fair and just compensation for the loss of the land, thus forced upon the Court and the party.
If Leftwich could not be heard to say that, such measure of compensation was unjust, ueither can his representatives. But if we cannot give the rents, because we cannot give the land also, on what principle is it, that we will direct even an account of the crops? If the land and profits must be considered as belonging to Leftwich, in the one case, why not in the other ? This would confine the accounts to the hires of the slaves and horses, considering them as supported and clothed by Jlnthony, and to the value of the improvements. All beyond will be profits of the land of Leftwich, as, by his fraud, it now turns out to be. Could this possibly be a just measure of compensation ?
I think not.
The decree ought, therefore, to be reversed, and the personal representative of Leftwich, in that character, be made a party to this suit; and unless he can change the aspect of this case from what it now appears to be, an account to be taken on the following principles.
*276 He ought to be charged with $3000, the moiety of the purchase money, instead of taking an account of the crops, during the five years, with interest thereon from the expiration of the five years; with the value of Anthony’s improvements made on the land, as well above as below the Cowhide branch. If both are not estimated, then Leftwich will have advanced both his daughters, in part, with Anthony’s money. He is also to be charged with a reasonable rent for the land, occupied by his testator, after the expiration of the five years, until his death.
Against these charges, he is to have credit for any advances, with interest thereon, made by his testator, to Anthony, and to be indemnified for any liabilities for him. If a balance shall be found in Anthony’s favor, and the personal fund shall prove inadequate to its payment, he is to have a lien on both parcels of the land, in proportion to their respective values, for such deficiency.
The other Judges, however, differing with me as to the manner of taking the account, I agree to the decree proposed to be entered.